Hiram L. SCHOONFIELD

v.

MAYOR AND CITY COUNCIL OF BAL-
TIMORE, a Municipal Cor-
poration, et al.

Civ. A. No. N–73–896.

United States District Court,
D. Maryland.

Aug. 20, 1975.

Patrick A. O'Doherty, Baltimore, Md., for plaintiff.

Norman P. Ramsey, H. Thomas Howell, Alan N. Gamse and Semmes, Bowen & Semmes, Baltimore, Md., for all defendants except Herbert J. Belgrad.

Stephen H. Sachs, Elizabeth Logan Nilson, Frederick J. Green, Jr., and Lord, Whip, Coughlan & Green, Baltimore, Md., for defendant Herbert J. Belgrad.

NORTHROP, Chief Judge.

The plaintiff, Hiram L. Schoonfield, the former Warden of the Baltimore City Jail, has brought this action seeking compensatory and punitive damages for injuries arising out of his allegedly wrongful dismissal from that position on September 22, 1972. The plaintiff having filed his amended complaint,[1] the case is now before this Court on motions by the various remaining defendants to dismiss the amended complaint, or in the alternative, for summary judgment.

The remaining defendants in the case are: 1) the Mayor and City Council of Baltimore, a municipal corporation; 2) William Donald Schaefer, individual-

---

1. The original complaint in this case was filed on September 5, 1973, and the case subsequently came before this Court on January 18, 1974, for a hearing on the defendants' motions to dismiss, or in the alternative, for summary judgment. Subsequent to that hearing, plaintiff filed a motion requesting leave to amend his complaint. On April 5, 1974, this Court issued an Order granting the motions by the various union defendants and by Herbert J. Belgrad, in his capacity as attorney for Local 44 of the American Federation of State, County, and Municipal Employees, to dismiss, or in the alternative, for summary judgment, without leave to amend. On the same date, the Court issued a further Order granting plaintiff leave to file his amended complaint.

ly and as Mayor of the City of Baltimore; 3) George L. Russell, Jr., individually and as City Solicitor of the City of Baltimore; 4) five of the seven members of the Jail Board of the City of Baltimore—H. Mebane Turner, President, Dr. Elaine C. Davis, Linwood Jennings, Walter E. Black, Jr., and Maurice A. Harmon—in both their individual and official capacities;[2] and 5) Herbert J. Belgrad, Esquire, in his individual capacity.

While plaintiff's amended complaint still leaves much to be desired from the point of view of precision and specificity, it appears that his operative claims are essentially as follows: 1) that he was discharged from his position as Warden of the Baltimore City Jail without having been granted a prior hearing in violation of his right to procedural due process of law under the fourteenth amendment (Count One); 2) that the defendants conspired to deprive him of equal protection of the laws, and of equal privileges and immunities under the laws, solely because of his race (white) and because of their desire to replace him with a black Warden, in violation of 42 U.S.C. § 1985 (Counts One and Five); 3) that the defendants Schaefer, Russell, Belgrad and Turner knew of the aforesaid conspiracy and of the actions contemplated in pursuance thereof and were in a position to have prevented the commission of the same, but did nothing to prevent the commission of those acts, in violation of 42 U. S.C. § 1986 (Count Five); 4) that the action of the members of the Jail Board in discharging him without first filing charges against him and holding a hear-

ing thereon constituted a breach of his contract of employment with the Mayor and City Council of Baltimore (Count Three); 5) that in causing his discharge, the defendants willfully and maliciously caused a breach by the Mayor and City Council of Baltimore of its contract of employment with him (Count Four); and 6) that defendant H. Mebane Turner maliciously published and caused to be published a letter dated September 22, 1972, which contained a certain libel, and which was widely disseminated (Count Two).

The theoretical bases for this action are the Civil Rights Act of 1871, 42 U. S.C. §§ 1983, 1985 and 1986, the fourteenth amendment to the Constitution of the United States, and the Constitution, statutory law and common law of the State of Maryland. Jurisdiction over the federal causes of action rests on 28 U.S.C. § 1343, while the state law claims are grounded on either the diverse citizenship of the parties,[3] 28 U.S.C. § 1332, or the doctrine of pendent jurisdiction. *See United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The amount in controversy, exclusive of interest and costs, exceeds the statutory prerequisite of $10,000.

The undisputed material facts underlying this controversy are as follows. In 1961, plaintiff was appointed Warden of the Baltimore City Jail by the then incumbent City Jail Board, acting pursuant to the powers vested in it by the Baltimore City Charter.[4] Thereafter, he continued to serve in that position until September 22, 1972, when, as the culmination of the events to be set forth here-

---

2. The remaining two members of the Jail Board, Dr. Bernard Harris, Jr., and Judge Avrum K. Rifman, were not named as defendants in this action, presumably because they had dissented from the Board's decision to dismiss plaintiff as Warden.

3. At all relevant times subsequent to the occurrence of the events detailed herein, the plaintiff has been a citizen of the State of New Jersey, while all of the defendants, including the Mayor and City Council of Balti-

more, are citizens of the State of Maryland. *See Moor v. County of Alameda*, 411 U.S. 693, 717–21, 93 S.Ct. 1785, 1800–02, 36 L. Ed.2d 596 (1973); *Taylor v. Prince George's County, Maryland*, 377 F.Supp. 1004, 1006–07 (D.Md.1974).

4. Article VII, section 51, of the Baltimore City Charter provides in pertinent part that "The Board shall appoint a Warden of the Baltimore City Jail . . . .."

in, he was removed from office by the Jail Board.

In *Collins v. Schoonfield*, 363 F.Supp. 1152, 1159 (D.Md.1973), Judge Harvey of this Court described the immediate backdrop to the events which are central to this case as follows:

> Warden of the Baltimore City Jail from 1961 to 1972, his term of office has been a stormy one, particularly in recent years. Because of inmate disturbances, strikes by Jail guards and other events occurring in 1971 and 1972, the administration of the Baltimore City Jail and the competency of defendant Schoonfield to be Warden became a subject of considerable public discussion in the Baltimore press. A Special Grand Jury undertook an extensive investigation of the Jail and rendered in July of 1972 a Report (which was not admitted in evidence in this case) criticizing conditions in the Jail. . . .

The "other events occurring in 1971 and 1972" referred to by Judge Harvey included the completion in January, 1972, of a special study by the Federal Bureau of Prisons, conducted at the request of Mayor Schaefer, which was highly critical of conditions existing at the Jail. Then in May, 1972, Judge Kaufman of this Court issued his Opinion in *Collins v. Schoonfield*, 344 F. Supp. 257 (D.Md.1972), holding that the conditions of confinement at the Jail violated certain minimal constitutional standards and decreeing broad equitable relief in connection therewith. Finally, in July, 1972, the Mayor's Special Committee on the Baltimore City Jail, the so-called Marbury Commission, issued its Preliminary Report concluding that during the previous six months little progress had been made in implementing the recommendations of the Federal Bureau of Prisons' Study.

It was with this background that the newly constituted Jail Board took office on July 26, 1972, with H. Mebane Turner being appointed by the Mayor to serve as its President. Almost immediately it became embroiled in the rising controversy.

On July 20, 1972, following disturbances of major proportions at the Maryland Penitentiary, the Maryland House of Correction and the Prince George's County Jail, representatives of Local 44 of the American Federation of State, County and Municipal Employees, which represented, *inter alia*, the correctional officers at the Baltimore City Jail, presented a list of written demands relating to working conditions at the Jail to Robert S. Hillman, Esquire, the Labor Commissioner for the City of Baltimore. One week later, on July 27, 1972, the correctional officers scheduled to report for work on the "B" shift at the Jail staged a wildcat strike and refused to report for work, primarily because of a lack of progress having been made on the previously submitted demands. Several union officials including Ernest Crofoot, Council-Director for the Maryland Public Employees Council 67, and Raymond Clarke, President of Local 44 and Assistant Council-Director, immediately proceeded to the Jail upon being informed of the situation and entered into negotiations there with the Warden and Mr. Hillman concerning the various demands. Some progress was apparently being made thereon when the Warden allegedly uttered a racial slur. The meeting almost immediately broke up. The union officials, including correctional officers, then went to Mr. Hillman's office where discussions continued.

At that time, Mr. Crofoot telephoned Herbert J. Belgrad, Esquire, a partner in the law firm representing the union,[5]

---

5. Although he was a partner in the law firm of Kaplan, Heyman, Engelman & Belgrad, which had represented the union in its dealings with public employers in Baltimore City and throughout the State of Maryland, Bel-grad himself had never previously served as attorney for the unit of correctional officers at the City Jail, nor had he ever had any communications with Warden Schoonfield as the legal representative of the union. In

and requested him to come down to the Commissioner's office to provide advice and assistance in working things out. After considerable negotiation the correctional officers finally agreed to return to work in exchange for a promise that the new Jail Board would schedule an immediate hearing to give them an opportunity to present their grievances against the Warden.

Hearings essentially limited to the alleged racial slur incident were held by the Jail Board on July 31 and August 2, 1972. Mr. Belgrad represented the union during the course of those hearings. At the conclusion thereof, the Jail Board ordered that the Warden be suspended for a period of two weeks. It further stated that it would begin immediately to study the conditions existing at the Jail, including the ability of the Warden to continue in his then present capacity.

Pursuant to the Jail Board's indication that the union would have an opportunity to present its additional grievances against the Warden, certain union officials and correctional officers met with Belgrad during the period of the Warden's suspension to discuss their various complaints and to request Belgrad to forward them to the Jail Board with a demand for immediate action. On August 14, 1972, having received information that the Warden had been violating the terms of his suspension, Belgrad telephoned Turner to inform him of the Warden's actions. That evening Turner, accompanied by George L. Russell, Jr., the City Solicitor, made an unannounced visit to the Jail to investigate Belgrad's allegations. Although Turner learned that the allegations were essentially true in that the Warden had been utilizing an inmate to walk his dog in the evenings and that the Warden had been interfering in the operations of the Jail during the period of his suspension, he took no further action at that time.

About August 17, 1972, Belgrad met with Turner to further discuss the specific allegations which had been brought to his attention concerning the Warden. Turner indicated that any charges would have to be made in writing before they would be considered. Belgrad thereafter drafted and submitted to Turner, with union approval, a letter dated August 18, 1972, detailing various alleged improprieties committed by the Warden. The allegations against the Warden were grouped basically into three categories: 1) appropriation of public food and supplies for personal use; 2) gross inaccuracies amounting to misrepresentations in the payroll records of both the Warden and Mrs. Schoonfield (also a correctional officer) involving personal, vacation and sick leave; and 3) utilizing inmate labor for personal use in and about the Warden's residence. Because of the serious nature of some of the charges, Belgrad requested that the information contained in his letter be turned over to the proper municipal investigative body for investigation to determine their validity prior to any disclosure being made either to the Jail Board or to the public.[6]

Upon receipt of Belgrad's letter on August 22, 1972, Turner immediately forwarded it to City Solicitor Russell with a request for a "thorough investigation of all the points made to determine the facts of the situation and your

---

fact, his only prior substantive contact with the City Jail had been through his appointment in April, 1972, to the Lawyers' Task Force of the Marbury Commission. In the instant case, Mr. Crofoot's call was referred to Belgrad only because of the absence on vacation of the partner who normally represented the union in its relations with the City Jail.

6. In his letter dated August 18, 1972, Belgrad stated in pertinent part as follows:

. . . Because of the serious and far-reaching implications of these charges, I believe that it would be in the public interest to have a full and objective investigation of the facts prior to any disclosure to the Jail Board and the public. Accordingly, I am requesting that the information contained in this letter be turned over to the proper municipal investigative body to determine whether the facts substantiate the alleged impropriety.

advice as to what position the Jail Board should take." [7] Turner particularly noted that he did "not want to raise these issues unless there is complete basis for their support." [8]

Pursuant to Turner's request, Russell referred the matter to Louis H. Diven, the Chief Assistant City Solicitor and head of the Central Bureau of Investigation, with the request that he conduct a personal and confidential investigation. During the ensuing weeks Diven interviewed various responsible Department heads and selected prison employees. He also received the names of certain other present and former City Jail personnel who could allegedly further corroborate or amplify the information received. He did not, however, contact those people at that time.

On September 12, 1972, Diven wrote a confidential memorandum to Russell detailing the results and scope of his investigation. Diven's two-page covering memorandum summarized the allegations against the Warden and concluded that, with one minor exception, his investigation had shown that they were substantially correct. Attached thereto was a more detailed eight-page breakdown of the various allegations with the results of Diven's investigations with respect to each one. Copies of the Diven report were forwarded to Mayor Schaefer and to Jail Board President Turner, accompanied by Russell's statement that the report provided factual substantiation of the Belgrad allegations and was sufficient to support disciplinary action against the Warden.

On September 14, 1972, Turner and another member of the Jail Board, Judge Avrum K. Rifman, met with the Warden at Turner's office at the University of Baltimore to inform him of the various pending allegations and that they would be referred to the Jail Board for appropriate action. At that meeting Turner handed the Warden a letter, dated September 14, 1972, enclosing a copy of the two-page Diven summary report, which Turner personally read to the Warden.

On September 15, 1972, Turner sent a letter to the members of the Jail Board informing them of the Belgrad letter of August 18, 1972, and of the results of the subsequent investigation by Diven. The letter also informed them that the Warden had been notified of the pending allegations and of the fact that Turner was going to refer them to the Board as a whole for appropriate action. Turner then requested the members of the Board to meet with him in executive session on Thursday, September 21, 1972, to discuss what procedure should be followed.

The scheduled Board meeting was held on the evening of September 21, 1972, at Turner's office. City Solicitor Russell was present and again informed the Board that the charges could be substantiated and that they warranted the Warden's dismissal. After considerable discussion it was determined by a 5-to-2 vote [9] that the Board would meet with the Warden the next day and that if he did not resign at that time, they would dismiss him. Turner subsequently called the Warden and requested that he meet with the Board the next morning.

On September 22, 1972, the morning edition of the Baltimore Sun carried an article containing the various allegations pending against the Warden. At 9:30 a. m., the Warden appeared before the Board in executive session with counsel, Patrick A. O'Doherty, Esquire, and a court reporter. In addition to the mem-

---

7. Letter from H. Mebane Turner, Jail Board President, to the Honorable George L. Russell, Jr., City Solicitor, dated August 22, 1972, at 1.

8. Id.

9. As previously noted, see note 2 supra, the dissenting votes were registered by Dr. Har-

ris and Judge Rifman, the latter feeling that the Warden should be granted a full-scale hearing prior to any dismissal. City Solicitor Russell, however, advised the Board that a pre-termination hearing was not required under the provisions of the City Charter and a majority thereof apparently elected to follow such advice.

bers of the Jail Board, with the exception of Dr. Davis whose proxy was held by Turner, City Solicitor Russell was also present. The purpose of the meeting, according to Turner, was to discuss informally the pending allegations and to decide upon the procedures to be followed. The meeting was not intended to be a formal hearing. After the City Solicitor once again assured the Board that the pending allegations could be substantiated, the Warden was given an opportunity to respond to them. Speaking through counsel, he denied the various allegations and insisted that he could prove that they were false.

Turner indicated that there were essentially three avenues of recourse open to the Warden and to the Board: 1) the Warden could resign; 2) a hearing on the allegations could first be held by the Board with the Warden then having the right to appeal the Board's decision to the Civil Service Commission and to have a *de novo* hearing there; or 3) the Board could dismiss the Warden at that time with his having the right to a *de novo* hearing before the Civil Service Commission.

The Warden indicated through his counsel that he would not resign under pressure. The decision as to what procedure the Board should follow in dealing with the allegations was left to the Board, however. No demand or request was made that the Warden be granted a pre-termination hearing before the Jail Board. After a further item-by-item denial of the pending allegations by the Warden through his counsel, the meeting was adjourned.

After a short recess, the Jail Board reconvened in open session at 11:25 a. m. Both the Warden and his counsel were again present. At that time the Board voted 4–2 [10] to remove the Warden from office. In accordance with the terms of the City Charter,[11] Turner signed and delivered to plaintiff a formal letter of dismissal, dated September 22, 1972, detailing five specific acts of conduct which the Board had determined amounted to conduct unbecoming an employee of the City and which had resulted in loss or injury to the City or the public, all in violation of Civil Service Commission Rule 56(1)(f) and (1)(h). The letter further informed plaintiff of his right, within five days from the date thereof, to request the Civil Service Commission to investigate his removal.[12] On September 27, 1972, plaintiff, acting through his counsel, filed a timely request for a hearing before the Civil Service Commission.

Pursuant to plaintiff's request, a full-scale evidentiary hearing as to the merits of the charges relied on by the Jail Board commenced before the Civil Service Commission on October 13, 1972. At the commencement thereof, plaintiff, speaking through his counsel, for the first time asserted that he should have been granted a hearing prior to his dismissal. He further alleged that his removal had been the result of a racially-motivated conspiracy between certain of the defendants herein.

The hearing before the Commission went on for 11 days and the transcript thereof, which has been filed with this Court, fills 13 bound volumes and totals 2,394 pages. During the course of the hearing the Jail Board, represented by Ambrose T. Hartman, Esquire, Deputy City Solicitor, called 17 witnesses and introduced some 49 exhibits. Plaintiff, represented again by Mr. O'Doherty,

---

10. Dr. Davis was absent from the meeting and although her proxy was held by Turner, no vote was entered on her behalf. Dr. Harris and Judge Rifman again dissented from the Board's action.

11. Article VII, section 118, of the Baltimore City Charter provides in pertinent part that: . . . In all cases of discharge, reduction or suspension for more than thirty days, the appointing officer shall furnish the subordinate so discharged, reduced or suspended, and also the [Civil Service] Commission, a copy of the order of discharge, reduction or suspension and also his reasons for such action.

12. *See* Baltimore City Charter, art. VII, § 118.

called four additional witnesses, including himself, Turner and Russell, and introduced 21 exhibits.

On the evening of November 6, 1972, at the conclusion of the presentation of evidence for the Jail Board and of the evidence for the plaintiff, but prior to the presentation of any rebuttal evidence and prior to any decision by the Commission, Joseph H. H. Kaplan, the President of the Commission, inquired of the parties as to whether there was any possibility of settling the matter since it was clear to the Commission that if the case had to go to a decision neither party would be happy with the result. He indicated that the Commission was of the opinion that the Warden would have to be acquitted of certain of the charges, but that at least one charge had been proven to the satisfaction of the Commission, thus requiring it to uphold the Board's action.

The parties then entered into further settlement discussions. Pursuant thereto, plaintiff on November 8, 1972, submitted a letter of resignation, dated November 9, 1972, to Mr. Kaplan. On that same date, the Jail Board, by informal action, authorized the City Solicitor to dismiss the charges filed against plaintiff. Those charges were actually dismissed the next day, November 9, 1972, and the hearing was concluded without any decision ever being reached by the Commission. The Warden's letter of resignation was delivered to the Jail Board, and at a special meeting on November 9, 1972, the Board resolved to reinstate the Warden as of September 22, 1972, and to accept his resignation dated November 9, 1972. Plaintiff subsequently received a check covering his back pay for the period from September 22, 1972 through November 9, 1972.

In the ensuing months the Jail Board, with the cooperation of the Civil Service Commission, embarked on a search for a new Warden. After narrowing the list of candidates to five persons, one of whom was black and the rest of whom were white, the Jail Board on June 27, 1973, nominated and elected Gordon C. Kamka, a white, as the new Warden of the Baltimore City Jail, effective July 16, 1973.

## SUMMARY JUDGMENT

In support of their instant motions to dismiss or, in the alternative, for summary judgment, defendants have submitted numerous, well-documented affidavits of those defendants and others who have knowledge of the events to which plaintiff's allegations are directed. In addition, they have filed the entire transcript of the proceedings before the Civil Service Commission. Finally, defendant Belgrad has filed a copy of plaintiffs own deposition.

■ In opposition to this rather formidable presentation, plaintiff is apparently relying on the hope that defendants, as the moving parties, have failed to meet the heavy burden placed on them to show that no genuine issue of material fact is present. *See Phoenix Savings & Loan, Inc. v. Aetna Casualty & Surety Co.*, 381 F.2d 245, 249 (4th Cir. 1967); *Molinaro v. Watkins-Johnson CEI Division*, 359 F.Supp. 467, 469 (D.Md.1973); 6 J. Moore, Federal Practice ¶ 56.15[3], at 2335 (2nd ed. 1974). The only papers which he has filed for purposes of this motion are: 1) the unverified amended complaint;[13] 2) a Reply Memorandum, filed August 22, 1974; 3) plaintiff's rather cursory affidavit, filed September 27, 1974, to the effect that the factual assertions contained in the Reply Memorandum are true and correct; and 4) an unverified Supplemental Memorandum, filed October 15, 1974.

Rule 56(e) of the Federal Rules of Civil Procedure provides in pertinent part that:

> When a motion for summary judgment is made and supported as pro-

13. Although plaintiff filed an affidavit in support of the original complaint, *see* Affidavit of Plaintiff in Support of Complaint, filed December 18, 1973, no comparable affidavit has been filed in support of the amended complaint.

vided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

In his Reply Memorandum plaintiff asserts that he will demonstrate that there are genuine issues of fact and that the evidence and inferences therefrom support the claims raised in the amended complaint.[14] However, the Reply Memorandum, even if treated as being wholly verified by plaintiff's subsequent affidavit, fails to set forth *"specific facts* showing that there is a genuine issue for trial."* Fed.R.Civ.P. 56(e) (emphasis added). Instead, it refers to facts which admittedly "are not yet in the record," but which plaintiff intends to establish at some unspecified future time.[15] Plaintiff further attempts to challenge the credibility of some of the defendants, notably defendant Belgrad, by attempting to point out various minor discrepancies in the affidavits and in the testimony before the Civil Service Commission. Finally, plaintiff relies on numerous so-called "inferences" which he alleges could be permissibly drawn from the presented facts.

■ None of the above tactics comports with the requirements of Rule 56(e). Neither plaintiff's rhetoric nor his imagination can make undisputed facts into disputed ones or raise a genuine issue with respect thereto. In *Zoby v. American Fidelity Co.*, 242 F.2d 76, 80 (4th Cir. 1957), the Fourth Circuit stated as follows:

It is well settled, however, that to resist a motion for summary judgment, the party against whom it is sought must present some evidence to indi-cate that the facts are in dispute, where the moving party's evidence has shown otherwise; and as to the foregoing matters, the record reveals no such evidence. His bare contention that the issue is disputable will not suffice.

*Cf. First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288–90, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968).

■ In *Walpert v. Bart*, 280 F.Supp. 1006, 1013 (D.Md.1967), *aff'd*, 390 F.2d 877 (4th Cir. 1968) (per curiam) this Court noted that in order for a party opposing a motion for summary judgment to raise an issue of credibility, "he must produce by way of affidavit or otherwise sufficient evidence to show the court that at trial he will be able to produce some fact to shake the credibility of the affiants. Mere hopes are not enough." (Citations omitted.) Thus, in *Radio City Music Hall Corp. v. United States*, 135 F.2d 715, 718 (2nd Cir. 1943), the Court stated that:

When a party presents evidence on which, taken by itself, it would be entitled to a directed verdict if believed, and which the opposite party does not discredit as dishonest, it rests upon that party at least to specify some opposing evidence which it can adduce and which will change the result.

Similarly, while a party opposing a motion for summary judgment is entitled to all of the favorable inferences to be drawn from the evidence, *Cram v. Sun Ins. Office, Ltd.*, 375 F.2d 670, 674 (4th Cir. 1967), such inferences must be firmly based on established facts. *Cf. First National Bank of Arizona v. Cities Service Co., supra*, 391 U.S. at 289–90, 88 S.Ct. at 1592–93. Plaintiff has failed to establish such facts in his Reply Memorandum. Nor does his last-minute affidavit avail him any, since it contains no new factual information above that

---

14. *See* plaintiff's Reply Memorandum to the Memoranda of all Defendants in Support of their Motions to Dismiss or for Summary

Judgment, filed August 22, 1974 (hereinafter "plaintiff's Reply Memorandum"), at 2.

15. *Id.*, at 3–5.

contained in the Reply Memorandum which it purports to verify.

This Court, therefore, determines that the pleadings, affidavits, exhibits, transcripts and depositions filed by the defendants clearly establish that there is no genuine issue as to any material fact with respect to the grounds of the decision to be set forth herein and that the defendants are entitled to summary judgment as a matter of law. There is no genuine relevant issue remaining for trial. *See Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458 (1962); *Vance v. Chester County Board of School Trustees*, 504 F.2d 820, 822 (4th Cir. 1974) (upholding summary judgment for defendants in civil rights suit by a black teacher alleging discriminatory discharge from employment and denial of due process).

## DISCUSSION

For purposes of discussion plaintiff's various claims can be divided into two distinct categories: 1) his federal claims arising under the civil rights provisions contained in 42 U.S.C. §§ 1983, 1985 and 1986 and under the fourteenth amendment; and 2) his state common law claims. To the extent plaintiff also raises any separate state constitutional claims under Articles 19 and 23 of the Maryland Declaration of Rights, the rights guaranteed by those provisions are essentially equivalent to "due process" as defined by the fourteenth amendment, *Sanner v. Trustees of Sheppard and Enoch Pratt Hospital*, 278 F.Supp. 138, 141–42 (D.Md.), *aff'd*, 398 F.2d 226 (4th Cir.) (per curiam), *cert. denied*, 393 U.S. 982, 89 S.Ct. 453, 21 L.Ed.2d 443 (1968), and such claims will be considered together with his federal claims.

## I. FEDERAL CLAIMS

■ As a prelude to substantive consideration of plaintiff's various federal claims, it must be noted that, as a municipal corporation, the Mayor and City Council of Baltimore is not a "person" either under 42 U.S.C. § 1983, *see City of Kenosha, Wisconsin v. Bruno*, 412 U.S. 507, 511–13, 93 S.Ct. 2222, 2226, 37 L.Ed.2d 109 (1973), *Monroe v. Pape*, 365 U.S. 167, 187–92, 81 S.Ct. 473, 484–86, 5 L.Ed.2d 492 (1961), *Harper v. Kloster*, 486 F.2d 1134, 1137–38 (4th Cir. 1973), or under 42 U.S.C. §§ 1985 and 1986. *See Bosely v. City of Euclid*, 496 F.2d 193, 195 (6th Cir. 1974); *Spampinato v. City of New York*, 311 F.2d 439, 440 (2nd Cir. 1962) (per curiam), *cert. denied*, 372 U.S. 980, 83 S.Ct. 1115, 10 L.Ed.2d 144 (1963); *Steel Hill Development, Inc. v. Town of Sanbornton*, 335 F.Supp. 947, 950 (D.N.H.1971). Since plaintiff has alleged no alternate basis of jurisdiction over the Mayor and City Council with respect to the federal claims,[16] those claims must be dismissed with respect to that defendant.

■■ Similarly, this Court has noted that when a suit is lodged against a public official with the intent and purpose of obtaining a judgment establishing a liability against the state, the suit is in actuality one against the state. *Bennett v. Gravelle*, 323 F.Supp. 203, 211 (D.Md.), *aff'd*, 451 F.2d 1011 (4th Cir. 1971), *cert. dismissed*, 407 U.S. 917, 92 S.Ct. 2451, 32 L.Ed.2d 692 (1972). Since the Mayor, City Solicitor and members of the Jail Board in their official capacities are extensions of the municipality, damages may not be assessed against them for acting in such capacities. *Id.* Moreover, as the legal advisor to the City, the City Solicitor cannot be held liable for damages arising out of acts committed in the performance of his official duties. *See Weathers v. Ebert*, 505 F.2d 514, 515 (4th Cir. 1974), *petition for cert. filed*, 43 U.S.L.W. 3503 (U.S. Feb. 7, 1975) (No. 74–987); *Modern Social Education, Inc. v. Preller*, 353 F.Supp. 173, 183 (D.Md. 1973), *aff'd in part and rev'd in part on*

---

16. *Cf. Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

*other grounds*, 512 F.2d 1241 (4th Cir. 1975) (en banc); *Tracy v. Robbins*, 40 F.R.D. 108, 112 (D.S.C.1966), *appeal dismissed*, 373 F.2d 13 (4th Cir. 1967) (per curiam). However, the other defendants may still be liable in their individual capacities, *see Scheuer v. Rhodes*, 416 U.S. 232, 238, 94 S.Ct. 1683, 1687, 40 L.Ed.2d 90 (1974), *Monroe v. Pape, supra*, although they would have a qualified immunity based on the good faith performance of their discretionary duties. *See Scheuer v. Rhodes, supra*, 416 U.S. at 238–49, 94 S.Ct. at 1687–93; *Bennett v. Gravelle, supra*, 323 F.Supp. at 212–14; *cf. Wood v. Strickland*, 420 U.S. 308, 314–322, 95 S.Ct. 992, 997–1001, 43 L.Ed.2d 214 (1975); *Pierson v. Ray*, 386 U.S. 547, 553–58, 87 S.Ct. 1213, 1217–19, 18 L.Ed.2d (1967).

■■ In the instant case it would appear, on the basis of the record currently before this Court, that the members of the Jail Board did act in good faith in discharging plaintiff without granting him a pre-termination hearing. In the first place they sought, and were granted, assurance from the Office of the City Solicitor that the allegations against the Warden had, in fact, been substantiated. Secondly, they acted in reliance on the provisions of the City Charter and the advice of the City Solicitor to the effect that no pre-termination hearing was required. *See Smetanka v. Borough of Ambridge, Pennsylvania*, 378 F.Supp. 1366, 1373 (W.D.Pa. 1974). Finally, at the September 22nd meeting with the Warden, they gave him the option of requesting a pre-termination hearing or of choosing to proceed directly to the Civil Service Commission, an option which he elected not to exercise. Similarly, there is no evidence that either the Mayor or City Solicitor acted other than in good faith. However, inasmuch as the defense of good faith is an affirmative one, *see Pritchard v. Perry*, 508 F.2d 423, 426 (4th Cir. 1975), this Court declines, on the basis of the record before it, to rest its opinion solely on such ground.

■ With respect to Belgrad, the remaining individual defendant, this Court feels that plaintiff has failed to present any evidence creating an issue of material fact as to the capacity in which he was functioning throughout the events described above. There is nothing to indicate that his actions were taken in any capacity other than as attorney for Local 44. Therefore, while he is subject to suit under the civil rights statutes as a private individual acting in conjunction with state officials, *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 152, 90 S.Ct. 1598, 1605–06, 26 L.Ed.2d 142 (1970), *Phillips v. Trello*, 502 F.2d 1000, 1004 (3rd Cir. 1974), *cf. United States v. Price*, 383 U.S. 787, 794, 86 S.Ct. 1152, 1156–57, 16 L.Ed.2d 267 (1966), he is entitled to all the defenses available to him as an attorney.

### A. Procedural Due Process

Turning to the merits of plaintiff's claims, his principal contention is that he was discharged from his position as Warden without having first been granted a full evidentiary hearing as to the validity of the charges against him, in violation of his right to procedural due process of law under the fourteenth amendment. It is, of course, by now well established that "[t]he Fourteenth Amendment forbids the State to deprive any person of life, liberty, or property without due process of law." *Goss v. Lopez*, 419 U.S. 565, 572, 95 S.Ct. 729, 735, 42 L.Ed.2d 725 (1975).

However, "the range of interests protected by procedural due process is not infinite." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 570, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). Thus, as stated, by Justice Powell, concurring in *Arnett v. Kennedy*, 416 U.S. 134, 164, 94 S.Ct. 1633, 1649, 40 L.Ed.2d 15 (1974), "[t]he applicability of the constitutional guarantee of procedural due process depends in the first instance on the presence of a legitimate 'property' or 'liberty' interest within the meaning of the Fifth or Fourteenth Amend-

ment[s]." The first step, therefore, in determining whether plaintiff was denied procedural due process is to determine whether he had any property interest in his continued employment sufficient to warrant the protection of the fourteenth amendment.

In defining what is sufficient to constitute a property interest in continued employment, the Supreme Court has stated that something less than a formal contract or tenure system need be involved. *See Perry v. Sindermann,* 408 U.S. 593, 599–602, 92 S.Ct. 2694, 2698–2700, 33 L.Ed.2d 570 (1972). Thus, a property interest may arise from existing rules or mutual understandings stemming from an independent source such as state law. *Board of Regents of State Colleges v. Roth, supra,* 408 U.S. at 577, 92 S.Ct. at 2709. However, "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it." *Id.* A mere subjective expectancy of continued employment is not enough. *Perry v. Sindermann, supra,* 408 U.S. at 603, 92 S.Ct. at 2700.

In *Goss v. Lopez, supra,* 419 U.S. at 572–73, 95 S.Ct. at 735, the Supreme Court recently restated its prior holding in *Board of Regents of State Colleges v. Roth, supra,* 408 U.S. at 577, 92 S.Ct. at 2709, regarding the sources of protected property interests as follows:

> Protected interests in property are normally "not created by the Constitution. Rather, they are created and their dimensions are defined" by an independent source such as state statutes or rules entitling the citizen to certain benefits.

*Cf. Bishop v. Wood,* 377 F.Supp. 501, 504 (W.D.N.C.1973), *aff'd* 498 F.2d 1341 (4th Cir. 1974) (per curiam), *petition for cert. filed,* 43 U.S.L.W. 3608 (U.S. April 16, 1975) (No. 74–1303). Thus, it is settled that "a state employee who under state law, or rules promulgated by state officials, has a legitimate claim of entitlement to continued employment absent sufficient cause for discharge may demand the procedural protections of due process." *Goss v. Lopez, supra,* 419 U.S. at 573, 95 S.Ct. at 735 (citations omitted).

In the instant case, although plaintiff had no formal contract of employment with the city, *cf. Duer v. Dashiell,* 91 Md. 660, 667, 47 A. 1040 (1900), the conditions of his employment were defined by the Baltimore City Charter. Section 51 of Article VII of the Charter provides that the Jail Board shall appoint a Warden of the Baltimore City Jail and sets forth the duties of the Warden.[17] Moreover, section 7 of Article IV provides that the heads of departments, including the Jail Board,[18] "shall have the sole power of appointment and removal of all deputies, assistants, clerks and subordinate employees employed by them, subject to the provisions of Sections 116 to 118 of Article VII, unless otherwise provided in the Charter." Pursuant to the latter provisions, once plaintiff had served a probationary period of six months,[19] he could be removed

---

17. Section 51 of Article VII of the Baltimore City Charter provides in pertinent part as follows:

It shall be the duty of the Warden of the Baltimore City Jail to take charge of the prison and prisoners therein and exercise, during his continuance in office, the same powers, be subject to the same forfeitures, and be responsible for escapes in the same manner, and to the same extent, as sheriffs of the several counties. He shall perform such other duties as shall be required of him by the Board.

18. The Baltimore City Charter, art. VII, § 50 provides that "[t]he Jail Board shall be a Department of the City . . .."

19. The Baltimore City Charter, art. VII, § 116 provides, in part, as follows:

116. CIVIL SERVICE COMMISSION —*Appointments.* When a vacancy occurs or a new position is created in the Classified Civil Service, other than the Exempt Class, the appointing officer shall fill such position provisionally by the appointment of one of the persons certified to him by

from office by the Jail Board "for any cause, other than ["his political opinions or affiliations, or for refusing to contribute to any political fund or refusing to render any political service"], which in [its] opinion . . . may interfere with the efficient discharge of the duties of the position." *Id.*, art. VII, § 118.[20]

Plaintiff contends that under those provisions he was only removable "for cause" and, therefore, that he was entitled to proper notice and an opportunity to be heard in his own defense *prior* to removal. *See Board of Street Commissioners of Hagerstown v. Williams*, 96 Md. 232, 239, 53 A. 923 (1903). Defendants, however, contend that plaintiff was removable by the Jail Board in the exercise of its discretion so long as such removal was for the good of the public service and not for one of the proscribed reasons. *See Director of Finance for the City of Baltimore v. Richter*, 270 Md. 226, 230–31, 310 A.2d 788 (1973); *Parr v. Severson*, 169 Md. 647, 652, 182 A. 595 (1936). Thus, they contend that plaintiff was merely serving at the pleasure of the Jail Board and therefore had no property interest in his continued employment. *See Hirsch v. Green*, 368 F.Supp. 1061, 1065–67 (D.Md. 1973), and cases cited therein.

In *Mondell v. Mayor and City Council of Baltimore*, 356 F.Supp. 76 (D.Md. 1973), 378 F.Supp. 219 (D.Md.1974), Judge Kaufman of this Court recently had occasion to consider a similar claim by a discharged city employee. In that case, although taking notice of the decisions in *Director of Finance for the City of Baltimore v. Richter, supra,* and *Parr v. Severson, supra,* Judge Kaufman concluded that the plaintiff, a former illustrator in the City Planning Department who had taken and passed the Civil Service examination for that position, was "a person who had a 'clearly implied promise of continued employment'" under *Board of Regents of State Colleges v. Roth, supra,* 408 U.S. at 577, 92 S.Ct. at 2709, and therefore "possessed a 'property interest' which could constitutionally be terminated only if she [was] afforded a hearing which comports with due process requirements." *Mondell v. Mayor and City Council of Baltimore, supra,* 378 F.Supp. at 221.

If it was necessary in the instant case to decide the issue of whether plaintiff had a sufficient property interest in his continued employment to invoke the protection of due process, this Court would be inclined to follow Judge Kaufman's holding in *Mondell, supra.* However, the Court does not feel that it is necessary to resolve that issue inasmuch as it is of the opinion that, even assuming *arguendo* that plaintiff did have a sufficient property interest in his continued employment, the hearing which he received before the Civil Service Commission was more than adequate to vindicate such interest. *Cf. Grimes v. Nottoway County School Board*, 462 F.2d 650, 652–53 (4th Cir.), *cert. denied,*

the Commission as above provided, which appointment shall be on probation for a period of six months. At or before the expiration of the period of probation such appointing officer, in the exercise of his discretion, may remove the said probationer. Unless so removed during the probationary period, the appointment shall be deemed complete. . . .

20. The Baltimore City Charter, art. VII, § 118 provides, in part, as follows:
118. CIVIL SERVICE COMMISSION —*Discharge. Re-employment, Part Time Employees.* (a) No person shall be discharged from the Classified Civil Service or be reduced in pay or position or suspended by the appointing officer for or on account of his political opinions or affiliations, or for refusing to contribute to any political fund or refusing to render any political service; but nothing in the provisions of the Charter relating to the Classified Civil Service shall forbid the removal, dismissal, reduction or suspension of any such officer or employee for any cause, other than those hereinbefore enumerated, which, in the opinion of the person authorized by law to remove or dismiss such officer or employee, may interfere with the efficient discharge of the duties of the position. . . .

409 U.S. 1008, 93 S.Ct. 439, 34 L.Ed.2d 300 (1972).

■ It has long been established that the fundamental requirement of due process is that one be granted "the opportunity to be heard," *Grannis v. Ordean,* 234 U.S. 385, 394, 34 S.Ct. 779, 783, 58 L.Ed. 1363 (1914), "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). *See Boddie v. Connecticut,* 401 U.S. 371, 377–79, 91 S.Ct. 780, 785–87, 28 L.Ed.2d 113 (1971). Normally that time would be prior to the deprivation of a protected interest. *Id.,* 401 U.S. at 378–79, 91 S.Ct. at 786; *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 656–57, 94 L.Ed. 865 (1950). However, the Supreme Court has recognized that "[t]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Cafeteria & Restaurant Workers Union, Local 473 v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed. 2d 1230 (1961). Thus, in *Goss v. Lopez, supra,* 419 U.S. at 579, 95 S.Ct. at 738–39, it recently reaffirmed that "the timing and content of the notice and the nature of the hearing will depend on appropriate accommodation of the competing interests involved." *Cf. Hubel v. West Virginia Racing Commission,* 513 F.2d 240, 242–43 (4th Cir. 1975); *Vance v. Chester County Board of School Trustees, supra,* 504 F.2d at 824–25.

In the present case the public interest is the maintenance of employee efficiency and discipline. As Justice Powell noted in his concurring opinion in *Arnett v. Kennedy, supra,* 416 U.S. at 168, 94 S.Ct. at 1651:

Such factors are essential if the Government is to perform its responsibilities effectively and economically. To this end, the Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch. Prolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the work place, foster disharmony, and ultimately impair the efficiency of an office or agency. Moreover, a requirement of a prior evidentiary hearing would impose additional administrative costs, create delay, and deter warranted discharges. Thus, the Government's interest in being able to act expeditiously to remove an unsatisfactory employee is substantial.

*See Vance v. Chester County Board of School Trustees, supra,* 504 F.2d at 825.

Plaintiff's countervailing interest is the continuation of his employment pending an evidentiary hearing. Since he would presumably be reinstated and awarded back pay if he prevailed at such a hearing, his actual injury would only consist of a temporary interruption of his income during the interim period. *See Arnett v. Kennedy, supra,* 416 U.S. at 169, 94 S.Ct. at 1651–52 (Powell, J., concurring).

Balancing those interests in the present case, this Court concludes that plaintiff had no right to a pre-termination hearing and that the full-scale evidentiary hearing before the Civil Service Commission to which he was entitled was fully adequate to satisfy the demands of due process. In *Arnett v. Kennedy, supra,* the Supreme Court recently had occasion to consider a similar argument to that raised here in the context of a discharged federal employee. While the divergent views of the Court in that case do not easily lend themselves to confident analysis, it is clear that five members of the Court felt that a pre-termination hearing was not constitutionally required.

Following that decision, Judge Kaufman of this Court held in *Mondell v. Mayor and City Council of Baltimore, supra,* 378 F.Supp. at 221–23, that a dis-

charged city employee had no right to a pre-termination hearing and that a post-termination hearing before the Civil Service Commission was sufficient to comport with due process requirements. This Court is in full accord with the views expressed by Judge Kaufman. *Cf. Woodson v. Leidinger*, 385 F.Supp. 892 (E.D.Va.1974).

Although it does not appear from plaintiff's amended complaint that he has alleged that he was deprived of a "liberty interest," [21] *see Board of Regents of State Colleges v. Roth, supra,* 408 U.S. at 572–75, 92 S.Ct. at 2706–08, to the extent such a claim might be deemed to have been raised, this Court notes that the post-termination hearing held before the Civil Service Commission was also sufficient to vindicate his interests in that regard. In *Arnett v. Kennedy, supra,* 416 U.S. at 157, 94 S. Ct. at 1646, the Court stated as follows:

. . . [L]iberty is not offended by dismissal from employment itself, but instead by dismissal based upon an unsupported charge which could wrongfully injure the reputation of an employee. Since the purpose of the hearing in such a case is to provide the person "an opportunity to clear his name," a hearing afforded by administrative appeal procedures after the actual dismissal is a sufficient compliance with the requirements of the Due Process Clause.

*See also Vance v. Chester County Board of School Trustees, supra,* 504 F.2d at 825.

In so holding, this Court declines to accept, on the basis of the record before it, defendants' argument that plaintiff's consenting to a dismissal of the charges before the Civil Service Commission constituted a waiver of his due process claim. However, the Court does feel that such action on his part indicated a conscious decision not to pursue to a conclusion the administrative process which he himself had initiated. He thus will be deemed to have waived any right to object to the adequacy of the hearing before the Commission, or to the fact that no decision was issued as to the validity of his contentions. *Cf. Harris v. Smith,* 418 F.2d 899, 901 (2nd Cir. 1969); *Keys v. Sawyer,* 353 F. Supp. 936, 939 (S.D.Tex.1973); *compare Christhilf v. Annapolis Emergency Hospital Association, Inc.,* 496 F.2d 174, 179–80 (4th Cir. 1974).

### B. Conspiracy

Plaintiff's second contention is that the defendants conspired to deprive him of equal protection of the laws and of equal privileges and immunities under the laws in violation of 42 U.S.C. § 1985.[22] Thus, he contends that he was discharged from his position as Warden "solely" because he was white and because defendants desired to replace him with a black.[23] Plaintiff further con-

---

21. *But see* plaintiff's Reply Memorandum, *supra* note 14, at 26–27.

22. 42 U.S.C. § 1985(3) provides in pertinent part:

(3) If two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or de-

prived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

23. *See* Amended Complaint, Count One, ¶¶ J and O, at 5, 6. *See also* Amended Complaint, Count Two, at 7–8. In this regard it should be noted that, contrary to the allegations of the Amended Complaint, plaintiff asserts in his Reply Memorandum, *supra* note 14, at 37, that the action taken against him was *only* "in part motivated by racial considerations." *See also id.* at 3.

tends that although defendants Schaefer, Russell, Belgrad and Turner were aware of such conspiracy and of the actions contemplated in pursuance thereof and were in a position to have prevented the commission of the same, they did nothing, in violation of 42 U.S.C. § 1986.

Defendants contend that plaintiff's allegations of conspiracy are insufficient to state a cause of action under section 1985. *See* Fed.R.Civ.P. 12(b)(6). They contend that section 1985(3) only provides a cause of action to persons of black ancestry. Moreover, they contend that plaintiff has failed to establish that he was the victim of any class-based discrimination. Finally, defendants contend that the undisputed facts established by the various affidavits and exhibits attached to their instant motions demonstrate that plaintiff's allegations are wholly without merit.

"Section 1985(3) creates civil liability against any persons who conspire to deprive any other person or class of persons of 'the equal protection of the laws, or of equal privileges and immunities under the laws.'" *Bellamy v. Mason's Stores, Inc. (Richmond)*, 508 F.2d 504, 506 (4th Cir. 1974). The section was not intended, however, to apply to all tortious conspiratorial interferences with the rights of others. *Griffin v. Breckenridge*, 403 U.S. 88, 101, 91 S. Ct. 1790, 1798, 29 L.Ed.2d 338 (1971); *Hughes v. Ranger Fuel Corp., Division of Pittston Co.*, 467 F.2d 6, 9 (4th Cir. 1972). Thus, it applies only to a conspiracy to deprive some person or class of persons of equal protection and not to a conspiracy to deny due process. *Collins v. Hardyman*, 341 U.S. 651, 661, 71 S.Ct. 937, 941, 95 L.Ed. 1253 (1951); *Joyce v. Ferrazzi*, 323 F.2d 931, 932 (1st Cir. 1963); *Jennings v. Nester*, 217 F. 2d 153, 154 (7th Cir. 1954), *cert. denied,* 349 U.S. 958, 75 S.Ct. 888, 99 L.Ed. 1281 (1955); *Collins v. Bensinger*, 374 F. Supp. 273, 277 (N.D.Ill.), *aff'd*, 506 F.2d 1405 (7th Cir. 1974) (unpublished opinion).

Moreover, a plaintiff only has an actionable claim under section 1985(3) if he can show that he was denied equal protection because of the class of which he was a member. In *Griffin v. Breckenridge, supra*, 403 U.S. at 102, 91 S.Ct. at 1798, the Supreme Court defined the type of conspiracy requisite to an action under section 1985(3) as follows:

> The language requiring intent to deprive of *equal* protection, or *equal* privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action. The conspiracy, in other words, must aim at a deprivation of the equal enjoyment of rights secured by the law to all. [Emphasis in original.]

Thus, a complaint alleging purposeful discrimination towards an individual with no allegation of racial or other class-based motivation is insufficient. *Hughes v. Ranger Fuel Corp., Division of Pittston Co., supra*, 467 F.2d at 10; *Byrd v. Local Union No. 24, International Brotherhood of Electrical Workers*, 375 F.Supp. 545, 552 (D.Md.1974); *Newcomer v. Coleman*, 323 F.Supp. 1363, 1367 (D.Conn.1970).

In his amended complaint, plaintiff alleges for the first time in this Court, that he was discharged solely because he was white. Defendants, citing *Griffin v. Breckenridge, supra*, 403 U.S. at 105, 91 S.Ct. at 1800, contend that section 1985(3) only creates a cause of action in favor of persons of black ancestry. However, that case involved an action by black citizens and the cited passage was excerpted from a discussion of the power of Congress to enact legislation under the thirteenth amendment. The Court stated in full as follows:

> We can only conclude that Congress was wholly within its powers under § 2 of the Thirteenth Amendment in *creating a statutory cause of action for Negro citizens who have been the*

*victims of conspiratorial, racially discriminatory private action aimed at depriving them of the basic rights that the law secures to all free men.* [*Id.*] [Emphasis added to indicate language cited by defendants.]

The Court did not speak to the issue of whether an action under section 1985(3) might be maintained by a white citizen under the fourteenth amendment.[24] Recent decisions by several lower courts, however, have recognized such a cause of action. *See Azar v. Conley*, 456 F.2d 1382, 1384–86 (6th Cir. 1972); *Action v. Gannon*, 450 F.2d 1227 (8th Cir. 1971); cf. *Bellamy v. Mason's Store, Inc. (Richmond), supra; Phillips v. Trello, supra*, 502 F.2d at 1005.

■■■ Assuming, therefore, that a white citizen could, in an appropriate case, maintain an action under section 1985(3), the mere conclusory allegations of racial discrimination contained in the instant complaint are nevertheless insufficient. As was pointed out by the Supreme Court in *Snowden v. Hughes*, 321 U.S. 1, 8, 64 S.Ct. 397, 401, 88 L.Ed. 497 (1944):

. . . a discriminatory purpose is not presumed, *Tarrance v. State of Florida*, 188 U.S. 519, 520, 23 S.Ct. 402, 403, 47 L.Ed. 572; there must be a showing of "clear and intentional discrimination," *Gundling v. City of Chicago*, 177 U.S. 183, 186, 20 S.Ct. 633, 635, 44 L.Ed. 725; . . . . .

In the instant case the facts alleged do not show any class-based discrimination. Unlike *Action v. Gannon, supra*, there is no allegation of any ongoing discriminatory activity, nor is there any allegation of a systematic pattern of discrimination. *Compare Harper v. Mayor and City Council of Baltimore*, 359 F.Supp. 1187 (D.Md.), *aff'd*, 486 F.2d 1134 (4th Cir. 1973).

This is not a case of the discharge of a white public official by an all-black board. *See Williams v. Hyde County Board of Education*, 490 F.2d 1231, 1233 (4th Cir. 1974) (per curiam). The Jail Board was bi-racial in composition with four white members and three black members. Moreover, the vote to dismiss plaintiff from his position as Warden cut across racial grounds with three white members and one black member voting for dismissal while one white member and one black member voted against such action. Furthermore, of the remaining individual defendants only one, City Solicitor Russell, is non-white.

Rather, this case is based on the unique allegation that a white warden was discharged by a basically white group of public officials because of his color and because they desired to replace him with a black in order to satisfy certain elements in the population. Yet, it is undisputed that after the Warden's dismissal, the Jail Board devised a racially neutral procedure for selecting a new warden, and that another white person was ultimately chosen as his replacement.

In this regard it should be noted that in *Gathercole v. Edwards*, No. 75–1615 (4th Cir., decided June 25, 1975) (per curiam), the Fourth Circuit recently affirmed the holding of the District Court for the Eastern District of North Carolina that a state prisoner's claim of racial discrimination under section 1985 was "frivolous" where both he and the defendants were of the same race. *See also Birnbaum v. Trussell*, 371 F.2d 672, 676 (2nd Cir. 1966).

In support of their instant motion defendants have submitted an impressive array of affidavits and exhibits negating any permissible inference that plaintiff was discharged because of his race. In contrast, the only evidence to which

---

24. The Court also noted that, given the facts of the case before it, it did not have to decide whether a conspiracy motivated by invidiously discriminatory intent other than racial bias would be actionable under 42 U. S.C. § 1985(3). *Griffin v. Breckenridge, supra*, 403 U.S. at 102 n. 9, 91 S.Ct. at 1798 n. 9.

plaintiff can point in support of his claim is his own belief that he was fired because he was white and that certain elements of the black community, represented by City Councilman Emerson R. Julian and the editors of the Afro-American newspaper, allegedly waged a campaign in support of his ouster.

■ Where the defendants have shown that the facts upon which plaintiff relies are not susceptible to the interpretation which he has sought to give them, Fed.R.Civ.P. 56(e) places the burden upon plaintiff to produce evidence of the alleged conspiracy. *See First National Bank of Arizona v. Cities Service Co., supra*, 391 U.S. at 289, 88 S.Ct. at 1593. In the instant case plaintiff has wholly failed to produce any such evidence. Moreover, he has failed to demonstrate that he was denied equal protection or that he was treated any differently than anyone else would have been under the circumstances. *See Joyce v. Ferrazzi, supra*, 323 F.2d at 933. As was stated by the Court in *Kletschka v. Driver*, 411 F.2d 436, 447 (2nd Cir. 1969):

. . . whatever other rights plaintiff may have been deprived of equal protection is not one of them. The actions taken by defendants were directed only against plaintiff as an individual and not because he was a veteran, or a member of some class or race. A violation of equal protection would be shown if the actions against plaintiff were part of a general pattern of discrimination, or were based on impermissible considerations of race or class, but plaintiff has not raised a genuine issue of fact concerning such discrimination.

*See also Bricker v. Crane*, 468 F.2d 1228, 1232–33 (1st Cir. 1972); *Hughes v. Ranger Fuel Corp., Division of Pittston Co., supra*, 467 F.2d at 10; *Birnbaum v. Trussell, supra*, 371 F.2d at 676; *Newcomer v. Coleman, supra*, 323 F.Supp. at 1367. Defendants' motions therefore will be granted with regard to plaintiff's claim under section 1985.

■ Inasmuch as 42 U.S.C. § 1986 is derivative of section 1985, where a party has failed to state a claim under section 1985, there is no ground for relief under section 1986. *See Azar v. Conley, supra*, 456 F.2d at 1385 n. 2; *Hahn v. Sargent*, 388 F.Supp. 445, 449–50 (D.Mass.1975); *Johnston v. National Broadcasting Co., Inc.*, 356 F.Supp. 904, 909–10 (E.D.N.Y.1973); *Seneca Constitutional Rights Organization v. George*, 348 F.Supp. 51, 57 (W.D.N.Y. 1972); *Post v. Payton*, 323 F.Supp. 799, 802 (E.D.N.Y.1971); *Huey v. Barloga*, 277 F.Supp. 864, 875 (N.D.Ill.1967). Defendants' motions therefore will also be granted with respect to that claim.

## II. STATE CLAIMS

Plaintiff's state law claims are essentially three in number: 1) breach of contract; 2) tortious interference with contractual rights; and 3) libel. Inasmuch as this Court's jurisdiction over those claims is premised on the diverse citizenship of the parties, their resolution must be governed by Maryland law. *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

■ The principle of sovereign or governmental immunity is "deeply ingrained in the law of Maryland." *Robinson v. Board of County Commissioners for Prince George's County*, 262 Md. 342, 345, 278 A.2d 71, 73 (1971); *Duncan v. Koustenis*, 260 Md. 98, 104, 271 A.2d 547 (1970). Thus, in Maryland, in the absence of any express legislative waiver of immunity, there can be no recovery against a municipal corporation for any action arising out of the performance of its governmental functions. *Robinson v. Board of County Commissioners for Prince George's County, supra*, 262 Md. at 345, 278 A.2d 71; *E. Eyring & Sons Co. v. Mayor and City Council of Baltimore*, 253 Md. 380, 382, 252 A.2d 824 (1969); *Gold v. Mayor and City Council of Baltimore*, 137 Md. 335, 112 A. 588 (1921). Moreover, as this Court noted in *Bennett v. Gravelle, supra*, 323 F.Supp. at 213, Maryland has

extended the concept of governmental immunity to all non-malicious acts of public officials when acting in a discretionary capacity. *See Duncan v. Koustenis, supra,* 260 Md. at 104, 271 A.2d 547; *Carder v. Steiner,* 225 Md. 271, 274, 170 A.2d 220 (1961); *State, Use of Clark v. Ferling,* 220 Md. 109, 112–14, 151 A.2d 137 (1959); *Cocking v. Wade,* 87 Md. 529, 40 A. 104 (1898).

While recognizing these principles, plaintiff contends, without citation of authority, that in the instant case the Mayor and City Council was not exercising any governmental function and should be liable for breach of its contract with him and for the acts of its agents. Moreover, he points out that the immunity accorded public officials in Maryland is only a qualified one, conditioned upon an absence of malice. *See Carr v. Watkins,* 227 Md. 578, 585, 177 A.2d 841 (1962); *compare Barr v. Matteo,* 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed. 2d 1434 (1959). In the instant case he contends that malice has been adequately alleged.

This Court has little difficulty in finding that in connection with the hiring and discharging of a public official such as the Warden of the Baltimore City Jail the Mayor and City Council acts in a governmental capacity. As stated by the Maryland Court of Appeals in *E. Eyring & Sons Co. v. Mayor and City Council of Baltimore, supra,* 253 Md. at 383, 252 A.2d at 825, citing *Mayor and City Council of Baltimore v. State, Use of Alice Blueford,* 173 Md. 267, 276, 195 A. 571 (1937):

> Where the act in question is sanctioned by legislative authority, is solely for the public benefit, with no profit or emolument inuring to the municipality, and tends to benefit the public health and promote the welfare of the whole public, and has in it no element of private interest, it is governmental in its nature.

In the instant case it is undisputed that the Warden is a public official with important governmental functions calling for the exercise of discretion and that part of the sovereignty of the state which is vested in him. *See Carder v. Steiner, supra,* 225 Md. at 274, 170 A.2d 220 (Warden of the Maryland House of Correction); *State, Use of Clark v. Ferling, supra,* 220 Md. at 113–14, 151 A.2d 137 (Superintendent of the Maryland State Reformatory for Males). Furthermore, under the Baltimore City Charter, art. VII, §§ 109, 118, he can be dismissed from office provided such dismissal is for "the good of the public service." *See Director of Finance for the City of Baltimore v. Richter, supra,* 270 Md. at 236–37, 310 A.2d 788, *citing Parr v. Severson, supra,* 169 Md. at 652, 182 A. 595.

In any event, as has been previously pointed out, plaintiff had no actual contract of employment with the City, and under Maryland law any action for wrongful discharge must be against the members of the Jail Board who alone were vested with the discretion to effect such discharge. *See Mayor and City Council of Baltimore v. O'Neill,* 63 Md. 336 (1885).

With respect to the various individual defendants other than Belgrad, assuming, *arguendo,* that the allegations of the amended complaint as to malice are sufficient to withstand a motion to dismiss, *cf. Carder v. Steiner, supra,* 225 Md. at 275–76, 170 A.2d 220, plaintiff has failed to produce any specific facts refuting the affidavits and exhibits of defendants negating an inference of malice. On this basis alone, therefore, those defendants would be entitled to summary judgment with respect to the various state law claims. However, the Court also believes that plaintiff's claims are substantively without merit.

### A. Breach of Contract

Plaintiff's claim for breach of contract is premised on the existence of an underlying contract of employment between him and the Mayor and City Council of Baltimore. However, in the instant case, plaintiff had no actual con-

tract of employment. Moreover, in *Duer v. Dashiell, supra,* 91 Md. at 667, 47 A. at 1041, the Court of Appeals of Maryland stated that the employment of public officials does not fall within the normal realm of contract law:

> It has long been settled that public officials are merely agents of the state for the carrying out of public purposes, and that their selection and the fixing of the length of time for which they shall serve are matters of public convenience or necessity, and do not fall within the scope of the term *contract* as applied to transactions between individuals out of which definite and vested rights of property arise. [Emphasis in original; citations omitted.]

The Court of Appeals has held that a discharged employee, alleging that his discharge was wrongful, cannot sue the municipality for back pay allegedly due since his discharge, but rather must sue the municipal officials discharging him for their want of good faith, if any, in effecting such discharge. *Mayor and City Council of Baltimore v. O'Neill, supra,* 63 Md. at 343–44.

▐ Since plaintiff had no contract of employment, his rights in connection therewith were those contained in the Baltimore City Charter, the instrument authorizing his appointment. *Cf. Arnett v. Kennedy, supra,* 416 U.S. at 151–52, 94 S.Ct. at 1643. That instrument, while providing that he could only be discharged "for any cause, other than those hereinbefore enumerated, which in the opinion of the person authorized by law to remove or dismiss such officer or employee, may interfere with the efficient discharge of the duties of the position," Baltimore City Charter art. VII, § 118, contains no provision for a pre-ter-

mination hearing. The only hearing provided for is one before the Civil Service Commission after discharge. In the instant case, such a hearing was available and, at plaintiff's request, was *actually convened until terminated* by agreement of the parties. Plaintiff thus received the only hearing to which he was "contractually" entitled and his claim for breach of contract is consequently without merit.

### B. Tortious Interference with Contractual Rights

In a somewhat related contention, plaintiff alleges that in causing his discharge the various individual defendants "willfully and maliciously caused a breach by the Mayor and City Council of the contract of employment between it and . . . plaintiff."[25] This claim is, in essence, one for tortious interference with contractual rights. Like his breach of contract claim, it is premised on the existence of an underlying contract of employment, and on a right under Maryland law to a preliminary hearing. Yet, as has just been demonstrated, plaintiff had no contract of employment as such and, furthermore, had no right to a pre-termination hearing. The only hearing to which he had any right was the one before the Civil Service Commission. Neither the various members of the Jail Board, Mayor Schaefer nor City Solicitor Russell did anything to interfere with plaintiff's right to a full and fair hearing before that body, and plaintiff has not alleged any deficiency with respect thereto in his amended complaint.[26]

▐ The only role played by defendant Belgrad in this regard was his action, as attorney for Local 44,[27] in bringing the various allegations of mis-

---

**25.** Amended Complaint, Count Four, at 9.

**26.** *But see* plaintiff's Reply Memorandum, *supra* note 14, at 22–23, alleging that certain conduct of defendants Schaefer and Turner between September 22, 1972, and the commencement of the Civil Service Commission hearing was designed to prevent him from

receiving a fair and meaningful hearing. Plaintiff further contended in his Reply Memorandum that "the hearing before the Commission actually degenerated into a circus." *Id.* at 24.

**27.** *See* discussion *supra* at 23.

feasance to the attention of Jail Board President Turner. Such action was fully within his privilege as attorney for the union and such communications criticizing a public official would in any event, be entitled to a qualified privilege under both the first amendment, *see New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and under Maryland common law, *see Orrison v. Vance*, 262 Md. 285, 292–94, 277 A.2d 573 (1971), citing Restatement, Torts, § 598, barring plaintiff from recovering any damages as a result thereof in the absence of a showing of actual malice. While plaintiff has alleged malice, as this Court has already noted, he has failed to introduce any specific facts supporting such allegation sufficient to raise a factual question barring summary judgment.

### C. Libel

Plaintiff's final claim is against Turner and the other defendant members of the Jail Board for libel based on publication of the notification of discharge letter of September 22, 1972.

In the first place, this Court is of the opinion that such claim is barred by Maryland's one-year statute of limitations applicable to libel actions. *See* Md.Ann.Code, Cts. & Jud.Proc. § 5–105 (1974), superseding Md.Ann.Code art. 57, § 1 (1972); *Atwell v. Retail Credit Co.*, 431 F.2d 1008, 1010 (4th Cir. 1970), *cert. denied*, 401 U.S. 1009, 91 S.Ct. 1251, 28 L.Ed.2d 544 (1971). Thus, although the cause of action accrued on September 22, 1972, the date of issuance of the letter, it was not first raised in this Court until plaintiff filed his motion for leave to file an amended complaint on March 8, 1974, more than one year later.

Plaintiff contends that the libel claim is saved from application of the bar of limitations under the "relation back doctrine" of Fed.R.Civ.P. 15(c). The critical element in determining whether a claim relates back under Rule 15(c), however, is whether the original complaint gave the defendants notice that a claim would be asserted based on the September 22nd letter. *See Williams v. United States*, 405 F.2d 234, 236–37 (5th Cir. 1968); *Brennan v. Tar Heel Home Supply, Inc.*, 62 F.R.D. 190, 194 (D.N.C.1974); *Shuman v. Sherman*, 356 F.Supp. 911, 915 n. 13 (D.Md.1973); *Jackson v. Airways Parking Co.*, 297 F.Supp. 1366, 1382–83 (N.D.Ga.1969). In the instant case the original complaint, while containing various allegations of libel, made only a passing reference to the September 22nd letter.[28] It can hardly be said, therefore, that it gave notice that a libel claim based thereon would subsequently be raised against the members of the Jail Board.[29]

Moreover, even if the libel claim could somehow be deemed to relate back to the original complaint, thus avoiding the bar of limitations, it would still fail since the members of the Jail Board were entitled to a qualified privilege under Maryland law with respect to

---

**28.** Paragraph 27 of the original complaint, at 10, provided as follows:

> The defendant members of the Jail Board in the executive session of the 22nd of September and in the absence of the Warden and contrary to their own rules and regulations fired the Warden in secret and notified him to attend a meeting one-half hour later wherein he was fired and then presented with the charges.

**29.** In this regard it should be noted that although the Federal Rules of Civil Procedure have liberalized pleading requirements, courts have traditionally required in actions of libel or slander that the allegedly false or defamatory matter be set forth *in haec verba*. *Holliday v. Great Atlantic & Pacific Tea Co.*, 256 F.2d 297, 302 (8th Cir. 1958); *Foltz v. Moore McCormack Lines, Inc.*, 189 F.2d 537, 539 (2nd Cir.), *cert. denied*, 342 U.S. 871, 72 S.Ct. 106, 96 L.Ed. 655 (1951); *Drummond v. Spero*, 350 F.Supp. 844 (D.Vt. 1972); *Kondos v. West Virginia Board of Regents*, 318 F.Supp. 394, 398 (S.D.W.Va.1970); *Simpson v. Oil Transfer Corp.*, 75 F.Supp. 819, 822 (N.D.N.Y.1948). *Compare* the Amended Complaint to which plaintiff attached a copy of the September 22, 1972 letter as Plaintiff's Exhibit No. One.

the September 22nd letter, and because plaintiff has failed to introduce any evidence of malice sufficient to withstand a motion for summary judgment.

 In this regard defendants contend that the publication of the September 22nd letter should be deemed to have been *absolutely* privileged. *See generally* Annotation, *Libel & Slander: Public Officer's Privilege as to Statements Made in Connection with Hiring and Discharge*, 26 A.L.R.3d 492, 497–505 (1969); *cf. Porter v. Eyster*, 294 F.2d 613, 616–18 (4th Cir. 1961). However, Maryland has not as yet adopted the doctrine of absolute privilege for quasi-judicial proceedings. *Macy v. Trans World Airlines, Inc.*, 381 F.Supp. 142, 146 (D.Md.1974); *cf. Carr v. Watkins, supra*, 227 Md. at 583–85, 177 A.2d 841. It has, however, adopted the doctrine of qualified privilege, and under Maryland law it is the responsibility of the Court to determine whether the allegedly libelous words were written on a privileged occasion. *Casale v. Dooner Laboratories, Inc.*, 503 F.2d 303, 306–07 (4th Cir. 1973); *Hollander v. Pan American World Airways, Inc.*, 382 F.Supp. 96, 102 (D.Md.1973); *Hanrahan v. Kelly*, 269 Md. 21, 29, 305 A.2d 151 (1973), *citing Fresh v. Cutter*, 73 Md. 87, 93–94, 20 A. 774 (1890).

In *Hanrahan v. Kelly, supra*, 269 Md. at 28, 305 A.2d at 156, the Court of Appeals of Maryland, citing its language in *Simon v. Robinson*, 221 Md. 200, 206, 154 A.2d 911 (1959), stated that "a libelous communication is privileged only when the occasion shows that the communicating party and the recipient have a mutual interest in the subject matter, or some duty with respect thereto." *See also Orrison v. Vance, supra*, 262 Md. at 292–93, 277 A.2d 573; *Stevenson v. Baltimore Baseball Club, Inc.*, 250 Md. 482, 486, 243 A.2d 533 (1968). In the instant case it is undisputed that the Jail Board had a duty, not only under the provisions of the City Charter but also under constitutional requirements of due process, to furnish plaintiff with a written statement of the charges against him and of the basis for his dismissal. In this respect the situation in the instant case is analogous to that existing in *Henthorn v. Western Maryland Ry.*, 226 Md. 499, 507–08, 174 A.2d 175 (1961), where the Court held that the defendant was entitled as a matter of law to the protection of a qualified privilege in revealing charges against a dismissed employee:

> Under the terms and provisions of the Railway Labor Act and the employment agreement executed pursuant thereto, the appellant had a right to the hearing and notice of the charges against him, and since he did, the defendant was entitled to the protection of a qualified privilege in revealing the charges. [*Id.*, 226 Md. at 508, 174 A.2d at 179.]

*See also Macy v. Trans World Airlines, Inc., supra*, 381 F.Supp. at 146–47 (statements of charge against suspended employee required under terms of Collective Bargaining Agreement were qualifiedly privileged). This Court therefore finds that defendants were entitled to the protection of a qualified privilege in the instant case.

 Under Maryland law, the effect of such a finding is to shift the burden of proof to the plaintiff to show actual malice. *Hanrahan v. Kelly, supra*, 269 Md. at 29, 305 A.2d 151; *Peurifoy v. Congressional Motors, Inc.*, 254 Md. 501, 513, 255 A.2d 332 (1969). In *Orrison v. Vance, supra*, 262 Md. at 295, 277 A.2d at 578, the Court of Appeals of Maryland, quoting from *Stevenson v. Baltimore Baseball Club, Inc., supra*, 250 Md. at 487, 243 A.2d 533, recently defined "malice" as "a reckless disregard of truth, the use of unnecessarily abusive language, or other circumstances which would support a conclusion that the defendant acted in an ill-tempered manner or was motivated by ill-will," and added that in determining an abuse of privilege all relevant circumstances are admissible.

**1092**

While the issue of malice will ordinarily be for the jury to decide, see *Hanrahan v. Kelly, supra,* 269 Md. at 29, 305 A.2d 151, the trial court must direct a verdict for defendants where plaintiff has failed to introduce evidence deemed legally sufficient to warrant submitting it to the jury. *Casale v. Dooner Laboratories, Inc., supra,* 503 F. 2d at 308. *See Peurifoy v. Congressional Motors, Inc., supra,* 254 Md. at 512–13, 255 A.2d 332; *Stevenson v. Baltimore Baseball Club, Inc., supra,* 250 Md. at 487, 243 A.2d 533. Similarly, on a motion for summary judgment, where the plaintiff has failed to produce specific facts permitting even an inference of malice, the Court must grant summary judgment for the defendant. *See Hollander v. Pan American World Airways, Inc., supra,* 382 F.Supp. at 99–105; *Macy v. Trans World Airlines, Inc., supra,* 381 F.Supp. at 144–48; *Orrison v. Vance, supra,* 262 Md. at 294, 277 A.2d 573.

In the instant case plaintiff has failed to submit any specific facts tending to show even an inference of malice on the part of the defendant members of the Jail Board with respect to issuance of the September 22nd letter. The charges contained therein were not made in reckless disregard of the truth inasmuch as the Board had been previously assured by City Solicitor Russell that they had been substantiated. Moreover, the language used in setting forth the charges was neither excessive nor abusive. Finally, the charges were set forth in a proper manner and were communicated to plaintiff, the proper party, on a proper occasion. *See Orrison v. Vance, supra,* 262 Md. at 295, 277 A.2d 573.

## CONCLUSION

For all of the reasons set forth herein, defendants' motions will be granted. Counsel for defendants are directed to submit an appropriate order in accordance with this Opinion within ten (10) days from the date of its filing.