144 N.J. Super. 109 (1976)
364 A.2d 1080
PATRICIA H. ENDRESS AND BROOKDALE COMMUNITY COLLEGE FACULTY ASSOCIATION, PLAINTIFFS-RESPONDENTS,
v.
BROOKDALE COMMUNITY COLLEGE, A PUBLIC INSTITUTION OF HIGHER EDUCATION OF NEW JERSEY, W. PRESTON CORDERMAN, AS CHAIRMAN OF THE BOARD OF TRUSTEES OF BROOKDALE COMMUNITY COLLEGE, AND INDIVIDUALLY, DONALD H. SMITH, AS PRESIDENT OF BROOKDALE COMMUNITY COLLEGE, AND INDIVIDUALLY, AND MARVIN A. CLARK, JOSEPH E. CLAYTON, MRS. T. PETER DOREMUS, WILLIAM O. FLECKENSTEIN, EARL B. GARRISON, ELLEN HANNAH, WALTER S. McAFEE, AND LEON ZUCKERMAN, AS MEMBERS OF THE BOARD OF TRUSTEES OF BROOKDALE COMMUNITY COLLEGE, AND INDIVIDUALLY, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued April 5, 1976.
Decided August 27, 1976.
*117 Before Judges FRITZ, SEIDMAN and MILMED.
Mr. Charles L. Morgan argued the cause for appellant Brookdale Community College (Messrs. Morgan & Falvo, attorneys).
Mr. John Warren, Jr., argued the cause for appellant Donald H. Smith (Messrs. Parsons, Canzona, Blair & Warren, attorneys).
Mr. James D. Carton, III, argued the cause for appellants Marvin A. Clark et al. (Messrs. Carton, Nary, Witt & Arvanitis, attorneys; Mr. Robert V. Carton, of counsel and on the brief).
Mr. Richard H. Mills, Deputy Attorney General, argued the cause for amici curiae Departments of Education and Higher Education, State of New Jersey (Mr. William F. Hyland, Attorney General of New Jersey, attorney; Mr. Stephen Skillman, Assistant Attorney General, of counsel).
Mr. Garrett M. Heher argued the cause for amici curiae Atlantic Community College et al. (Messrs. Smith, Stratton, Wise & Heher, attorneys; Ms. Ann Reichelderfer on the brief).
*118 Mr. William S. Greenberg argued the cause for respondents (Messrs. Sterns & Greenberg, attorneys; Mr. William Bigham and Mr. Frank J. Petrino on the brief).
Mr. Cassel R. Ruhlman, Jr., filed a brief on behalf of amicus curiae National Education Association (Mr. Jerry D. Anker, Mr. Robert E. Nagle and Mr. David Rubin, all of the Washington, D.C., bar, on the brief).
The opinion of the court was delivered by SEIDMAN, J.A.D.
These consolidated appeals are from a judgment in favor of plaintiff reinstating her as a member of the faculty of defendant college with back pay and other benefits, and awarding her damages, both compensatory and punitive, plus counsel fees and costs.

I
On June 27, 1974 plaintiff Patricia H. Endress, an Assistant Professor of Journalism at Brookdale Community College, a public institution of higher learning located in Lincroft, Monmouth County, was discharged from her employment and her contract for the next academic year was rescinded[1] by resolution adopted by the college board of trustees upon the recommendation of the president.
The controversy which led to Professor Endress' dismissal and this litigation had its origin in an editorial written by her which appeared in the April 26, 1974 edition of The Stall, the student newspaper of which she was the faculty advisor. In substance, it accused the chairman of the board of trustees of a conflict of interest in allegedly making "a deal" whereby his nephew's company received a contract from the college for the furnishing of audio-visual equipment. *119 An accompanying article on the same subject was written by her assistant, a "journalism intern."
In recommending the dismissal to the board of trustees the president of the college asserted as the alleged causes for such action plaintiff's violation of "both the tradition established under Board policy, and the philosophical platform and goals of the College as the same pertain to freedom of the press and student responsibility for the college newspapers," and of the "editorial prerogatives of the student editor and the student staff," in ordering and directing the editor of the newspaper "to publish certain material without his approval," and in causing the publication of "libelous matter contrary to accepted journalistic standards."
Professor Endress thereupon filed a multi-count complaint, in which the Brookdale Community College Faculty Association joined as plaintiff,[2] against the college; and also, in both their official and individual capacities, against W.P. Corderman, chairman of the board of trustees; Donald H. Smith, president of the college, and the other members of the board of trustees. The complaint charged, among other things, that her employment had been wrongfully terminated, that Corderman and Smith had wrongfully and maliciously interfered with her existing contractual relationship, and that they had conspired among themselves and the other board members to breach that contract; that Smith and the members of the board of trustees had libeled her by the publication of a letter charging her with violating her duties and responsibilities,[3] and that she was *120 discharged solely by reason of her exercise of her constitutional right of "freedom of the press, association and speech."
Defendants contended generally that the discharge of Professor Endress and the rescission of her new contract were (we quote from the oral decision of the trial judge) "all due and proper actions incumbent upon them in the exercise of their duties in their respective capacities, were in no way arbitrary, capricious or conspiratorial, and that the action did not breach any of their respective contractual obligations [with plaintiff]." President Smith asserted, additionally, that he had determined that Professor Endress had violated her duties and obligations as a member of the faculty and as advisor to the college newspaper, and, in accord with his duties and responsibilities, had recommended to the board of trustees the termination of her employment. He denied the existence of any conspiracy, as did Corderman, who also contended that he was not present at the June meeting of the board of trustees and did not participate in the action taken. Leon Zuckerman, one of the trustees, also disclaimed individual responsibility for the action of the board, in that he was absent at the time. Another board member, Joseph E. Clayton, contended that although he attended the board meeting he did not vote affirmatively for the termination and therefore could not be held liable therefor.
At the conclusion of the trial, the judge below, sitting without a jury, entered the following judgment:
1. Defendant, BROOKDALE COMMUNITY COLLEGE, shall forthwith pay to the plaintiff, PATRICIA H. ENDRESS, the sum *121 of $14,121.00 as back pay for the period of July 1, 1974 through June 30, 1975.
2. Defendant, BROOKDALE COMMUNITY COLLEGE, shall forthwith pay to the appropriate trustee or agency all pension or retirement contributions, in such amount as would have been paid on behalf of plaintiff, PATRICIA H. ENDRESS, had she been employed at BROOKDALE COMMUNITY COLLEGE between July 1, 1974 and June 30, 1975 at an annual salary of $19,121.00.
3. Defendant, BROOKDALE COMMUNITY COLLEGE, shall forthwith issue plaintiff, PATRICIA H. ENDRESS, an employment contract for the period July 1, 1975 through June 30, 1976, as an Assistant Professor of Journalism in the faculty of BROOKDALE COMMUNITY COLLEGE, which contract shall have the same force and effect as though issued for the period July 1, 1974 through June 30, 1975.
4. The aforesaid employment contract for 1975-1976 shall contain compensation for plaintiff, PATRICIA H. ENDRESS, in the amount she would normally have received had she been continuously employed from and after June 27, 1974, including all normal increments, fringe benefits, and contributions to pension or retirement funds.
5. By reason of the violation of the constitutional rights of plaintiff, PATRICIA H. ENDRESS, and in accordance with the provisions of Section 1983 of Title 42 of the United States Code, damages are awarded as follows:
(A) $10,000.00 compensatory damages in favor of plaintiff, PATRICIA H. ENDRESS, against individual defendants, Smith, Clark, Doremus, Fleckenstein, Garrison, Hannah and McAfee, jointly and severally; and
(B) $10,000.00 punitive damages in favor of plaintiff, PATRICIA H. ENDRESS, against each of the defendants, DONALD H. SMITH, MARVIN A. CLARK, MRS. T. PETER DOREMUS, WILLIAM O. FLECKENSTEIN, EARL B. GARRISON, ELLEN HANNAH and WALTER S. McAFEE, individually, for a total of $70,000.00.
6. By reason of the violation of the constitutional rights of plaintiff, PATRICIA H. ENDRESS, and in accordance with the provisions of Section 1983 of Title 42 of the United States Code, attorneys' fees are awarded to WILLIAM S. GREENBERG, ESQ. in the amount of $10,000.00, and shall be paid by all individual defendants named in the preceding paragraph, jointly and severally.
7. Costs are awarded to plaintiff Endress against defendants except Corderman, Clayton and Zuckerman.
8. By reason of the interference with the contractual relationship of plaintiff, PATRICIA H. ENDRESS, and the prospective professional and economic advantage of plaintiff, PATRICIA H. ENDRESS with BROOKDALE COMMUNITY COLLEGE by defendant, DONALD H. SMITH, there shall be judgment for plaintiff, PATRICIA H. ENDRESS, against defendant, DONALD H. *122 SMITH, with no additional money damages; provided, however, in the event the award of damages under Paragraph Five hereof is reversed on appeal, then there shall be an award of $10,000.00 compensatory damages and $10,000.00 punitive damages in favor of plaintiff, PATRICIA H. ENDRESS, against defendant, DONALD H. SMITH, individually.
9. With respect to the claims of BROOKDALE COMMUNITY COLLEGE FACULTY ASSOCIATION there shall be judgment for defendants.
10. With respect to the claims against defendants, W. PRESTON CORDERMAN and DONALD H. SMITH, as to allegations of conspiracy, there shall be judgment for said defendants.
11. Judgment is entered in favor of defendants Corderman, Clayton and Zuckerman, individually.
The grounds of appeal asserted by Brookdale Community College are that (1) the "termination of the plaintiff, Patricia H. Endress, did not violate any constitutionally protected right," (2) just cause existed for the termination, and (3) specific performance of plaintiff's contract of employment cannot be adjudged. President Smith contends that (1) there was no "legal issue resolved by the court imposing any responsibility" upon him, (2) the assessment against him of additional damages in the event of appellate reversal was without validity, and (3) he "acted in good faith upon facts he believed to be true in the exercise of his discretion and judgment" in recommending the dismissal of plaintiff. He also poses the question, "Is an agent responsible for the actions of his principal?" He asserts, additionally, that "facts revealed after June 27 solidify [his] recommendation to terminate."[4] Appellant trustees raise as issues alleged error on the part of the trial judge in awarding (1) "compensatory relief" against them, (2) damages "for a violation of plaintiff's right of due process," (3) punitive damages, and (4) "attorney's fees in an action brought under 42 U.S.C. § 1983"; and also in not *123 giving credit for the amount of the settlement. (See footnote 3).
The awarding of punitive damages against the individual trustees is also assailed in the brief filed on behalf of amici curiae Atlantic Community College et al.[5] The argument advanced is that such damages should not be awarded under 42 U.S.C.A. § 1983 unless "a positive element of conscious wrongdoing has been proven."
The Departments of Education and Higher Education of the State of New Jersey, in an amici curiae brief filed on their behalf by the Attorney General, complain of the failure of the trial judge "adequately to explain the reasons for the awarding of substantial damages against the trustees of a public educational institution." They argue that because such awards "will necessarily have a powerful and undesirable impact upon the State educational system," it is important that they "clearly reflect the application of established legal principles to specific articulated findings of fact." It is contended further that plaintiff should have been required to exhaust her administrative remedies within the Department of Higher Education before bringing her reinstatement action in the courts.[6]
*124 The National Education Association also submitted an amicus curiae brief in which it argued the correctness of the holding below that the termination of plaintiff's employment violated both her right of free speech and her right to procedural due process, and of the relief granted.

II
Professor Endress had been advisor to the school newspaper, which was also utilized as a training program for journalism students, from the time she came to work for the college in September 1971. She testified at the trial that she sought to have her students pursue an investigative reporting approach to journalism. While student copy was submitted to her, she had no censorship role and exercised no editorial veto. The student editors were fully responsible for that which was published. Explaining that they were always short staffed, she said that she had written an earlier editorial, as well as two articles, but, she added, she never wrote anything over the objections of the editor and, further, she had never been specifically forbidden by the college administration to write editorials or articles for the newspaper.
It appears that in August 1973, as the result of rumors circulating about the campus concerning several contracts awarded by the college, including the one involving Corderman's nephew, Professor Endress and her assistant thought that an investigation of the matter would be good experience for the students. Accordingly, the project was undertaken in consultation with the editorial staff. Several students were assigned to the investigation and articles on the subject were published.
Professor Endress said that because the student editor-in-chief and other members of the staff were either too busy to write an editorial on the subject, which she considered appropriate, or "did not know what to say," she undertook to prepare the one in question and submitted it, together *125 with the article, to the editor-in-chief, who expressed no opposition to either. However, several days after publication the editor indicated to her that he was worried and upset because "Duncan Circle [Dean of Student Development] was after him, meaning he wanted to know the things about the paper," and the college administration had issued a statement in which libel was mentioned.
Thereafter, except for the semi-annual faculty evaluation report issued by her superior early in June, which was generally favorable except for the comment that "as advisor of the student newspaper, [she] must resist dominating the editorial policy of the paper * * *," and to which she responded that she would address herself to the comment upon her return for the summer session, she had no other contact with the administration concerning the matter until she learned of her dismissal when she came back from her vacation.
A former student managing editor of the newspaper, who had approved both the article and the editorial in question, testified that she had never been ordered to publish them or subjected to any pressure or coercion.
The student editor-in-chief, one William McGee, gave controversial testimony. Acknowledging that he had read and approved the material before publication, he said that he had not been ordered to do anything with respect to it, but he also revealed that he expressed to Dr. Circle his dissatisfaction with the secrecy with which the matter had been handled in advance of publication and with the failure of those working on the story to tell him about it. In a signed statement he gave to the administration he said that when the editorial and article were presented to him "it represented a loss of my power and function as an editor and I wanted immediately to resign as editor." He also related in it that although he could not be certain who wrote the article and the editorial, "I knew that I was compelled to include both * * * without question * * * "by Professor Endress and her assistant. He said he deemed her *126 action to be "the unwarranted interference with my function as an editor as well as the violation of what has been the administrative policy toward the Stall." However, in his testimony below, McGee stated that, so far as he knew, "we had no Stall policy." He said further that "I didn't really feel that I had lost any power because I did approve [the article]." Plaintiff's assurance that there was no chance of his being sued for libel "quelled his desire to resign." And, as for being "compelled" to print the story, he said that he had not realized when he gave the statement that the word meant "forced to do so"; rather, it meant to him that "I should run this article" because it seemed to be a good one and he was told the information was correct.
Plaintiff produced as an expert witness a professor emeritus of journalism at Northwestern University in Illinois. He opined that the writing of the editorial was a valid exercise of First Amendment rights and that there was nothing unprofessional in plaintiff's conduct. It was immaterial who wrote these articles and editorials, he said, so long as the editor "had the handling of them."
Defendant's expert, a professor of journalism at Columbia University, was of the view that plaintiff's actions, even if approved by the editorial staff, were not consistent with her functions and duties as a faculty advisor to the newspaper, and constituted a "serious breach of professional ethics."
President Smith's version of the events was that after he read the April 26 edition of the newspaper he asked Dr. Circle and Dr. John F. Gallagher, vice-president for academic affairs, to conduct an investigation. Their reports convinced him that the article and editorial had not been written by students, as the initial inquiries had indicated, but by "Miss Endress or Mr. Karey [her assistant] or both," and he "asked for verification of the statement made to Dr. Circle by the editor-in-chief, Mr. McGee," and a written statement was obtained from him. He reported to the board of trustees at their May meeting the results of the investigation *127 and reviewed "the implication of the fact that it seemed to be clear that the article and editorial had been written not by students but by staff," but he made no recommendation at that time.
On June 7, following additional discussions with board members, President Smith attempted to make contact with plaintiff but was unable to do so because of her absence on vacation.
Decisive action was taken on June 27. President Smith formally recommended to the board the dismissal of plaintiff and the rescission of the new contract for the reasons summarized earlier herein. The board accepted the recommendation and adopted an accordant resolution.

III
In his oral opinion issued at the close of the evidence, the trial judge addressed himself first to the issue of whether the board of trustees had just cause to terminate plaintiff's employment under the contract expiring June 30, 1974, and to rescind the new contract.
The trial judge found that the student editors had approved the use of the article and editorial and that neither plaintiff nor her assistant had ordered their publication. He gave credit to McGee's testimony in court and not to the signed statement, which, he found, "was prepared by somebody who had not talked personally to McGee." He rejected the first reason given for plaintiff's discharge, namely, that she had violated her duties and responsibilities as a journalism teacher and advisor to the newspaper by ordering the publication of the article and editorial. Further, he said, even if plaintiff had caused the material to be published without the editor's permission, she would have been subject to severe reprimand, but not to dismissal.
As for the second reason given for dismissal, that the material was allegedly libelous, the trial judge found that the "[d]efendants have failed to establish that the editorial *128 was written with malice or with reckless disregard to its truth," and that, essentially, it was based on the article. Cf. Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).
The trial judge found, further, that the real reason for plaintiff's dismissal was not dissatisfaction with her services but, rather, "the incorrect feeling that she had libeled Corderman." He said that the written recommendation President Smith had received from Dr. Gallagher for termination "was gotten merely for show  to build the case against Endress." Smith, he said, "had already made up his mind." He added that, with the exception of Corderman, "I was strictly unimpressed with the testimony of the Brookdale employees. None of it holds up. It is all tailored to support the termination." He put "little stock in any of Smith's testimony."
The conclusions reached were that just cause did not exist for the board's action, and that the dismissal and the termination of the 1974-1975 contract were illegal.
Counsel for Brookdale Community College takes issue with these findings and conclusions and argues that
* * * the evidence upon the whole case, given proper Contextual consideration, affords a sufficient base for a conclusion that the plaintiff was terminated because of her own failure to observe the duties and obligations of her position as advisor and not for the exercise of her right of free expression.
But the scope of our review is clear. It is, of course, whether the findings made could reasonably have been reached on sufficient credible evidence present in the record, considering the proofs as a whole, with due regard to the one who heard the witnesses to judge of their credibility. Close v. Kordulak Bros., 44 N.J. 589, 598-599 (1965); State v. Johnson, 42 N.J. 146, 162 (1964). Our thorough canvass of the record satisfies us that the findings here meet this criterion, and that there was a rational basis for the conclusions stated by the trial judge. Cf. In re Tenure *129 Hearing of Grossman, 127 N.J. Super. 13, 23 (App. Div. 1974), certif. den. 65 N.J. 292 (1974).
It is particularly noteworthy that on the same day that the editorial appeared the president mailed to Professor Endress her new contract and congratulated her on attaining tenure. Moreover, all previous evaluation reports spoke well of her work, especially as advisor to the newspaper. She received praise for achieving "notable success" in "rais[ing] the quality of the college paper." In December 1973 she was called "a dedicated member of the faculty" and was again commended for "[c]ontinuing the quality of the Stall." The tenure recommendation prepared by her dean noted that she "has brought a solid professional background, academically and experientially, to the development of the Journalism program," and that her work as advisor had resulted in the paper's receiving its first award from The Associated Collegiate Press "with marks of distinction in coverage and content."
We discern no sound basis for disturbing the holding below that just cause did not exist for dismissing plaintiff from her employment or for rescinding the 1974-1975 contract.

IV
It is evident that at the time of plaintiff's dismissal only three days remained before the existing contract would have expired. Consequently, the substantial relief adjudged below was that plaintiff was entitled to specific performance of the new contract. Additionally, since plaintiff would thereby have acquired tenure, the trial judge also ordered the college to give plaintiff a contract for the year July 1, 1975 to June 30, 1976, with any concomitant salary increment. He ruled, further, that she was entitled to the sum of $14,141, representing her full salary under the 1974-1975 contract, less the sum of $5,000 earned in outside employment, and also to the payment by the college of all pension or retirement *130 contributions that would have been paid on her behalf during that period.
The college contends that as the employment contract was one which called for the rendering of personal services by plaintiff, specific performance could not be adjudged. It is settled law, of course, as the trial judge here readily acknowledged, that personal service contracts are generally not specifically enforceable affirmatively. Sarokhan v. Fair Lawn Memorial Hospital, Inc., 83 N.J. Super. 127, 133 (App. Div. 1964). See also, Fiedler, Inc. v. Coast Finance Co., Inc., 129 N.J. Eq. 161, 166-167 (E. & A. 1941).
But we held in Katz v. Gloucester Cty. College Bd. of Trustees, 125 N.J. Super. 248, 250 (App. Div. 1973), that it was no longer open to question that a public agency may neither dismiss from employment nor withhold renewal of a contract from a nontenured public employee for a reason or reasons founded upon the exercise of a constitutionally protected right. See Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); Pickering v. Board of Education, supra; Donaldson v. No. Wildwood Bd. of Ed., 65 N.J. 236, 242 (1974); Burlington Cty. Evergreen Pk. Mental Hosp. v. Cooper, 56 N.J. 579, 583 (1970). Although not clearly articulated below by the trial judge on the dismissal and reinstatement issue, it is thoroughly clear from a reading of the entire opinion that he was of the view, with support in the record, that plaintiff's employment was terminated improperly because of her exercise of First Amendment rights of free speech and press. In such case, the remedy of specific performance is appropriate. In American Ass'n of Univ. Prof. v. Bloomfield College, 136 N.J. Super. 442 (App. Div. 1975), in which we affirmed the trial court's determination that financial exigency was not the bona fide cause for the decision to terminate tenured faculty members, appellants asserted, as they had below, that the remedy of specific performance ran counter to the line of legal precedents *131 denying such relief in cases involving personal service contracts. We found no merit in the argument:
We agree with the trial judge that the general rule is not inflexible and that the power of a court of equity to grant such a remedy depends upon the factual situation involved and the need for that type of remedy in a particular case. See 11 Williston, Contracts, § 1424 at 786. A lack of precedent, or mere novelty, is no obstacle to equitable relief which may be appropriate in a particular fact complex. Cooper v. Nutley Sun Printing Co., Inc., 36 N.J. 189, 198 (1961). In view of the uncertainty in admeasuring damages because of the indefinite duration of the contract and the importance of the status of plaintiffs in the milieu of the college teaching profession, it is evident that the remedy of damages at law would not be complete or adequate. See opinion below, 129 N.J. Super. [249], 273 et seq.; Fleischer v. James Drug Stores, 1 N.J. 138 (1948); Mantell v. International Plastic Harmonica Corp., 141 N.J. Eq. 379 (E. & A. 1947); Pomeroy's Equity Jurisprudence (5 ed. 1941), § 1401. The relief granted herein is appropriate to achieve equity and justice. [136 N.J. Super. at 448]
We are entirely satisfied that the trial judge here correctly accorded plaintiff the relief contained in paragraphs one through four of the judgment.

V
We turn to the determination below that the individual defendants (excluding the three who were exonerated) had deprived plaintiff of her constitutional rights in violation of 42 U.S.C.A. § 1983 (Act Apr. 20, 1871, c. 22, § 1), and the assessment of compensatory damages against them jointly and severally in the sum of $10,000, and of punitive damages against each in the sum of $10,000, plus a counsel fee of $10,000.
The cited section of the Federal Code is derived from the Civil Rights Act of 1871 and provides as follows:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
*132 Although neither the pleadings nor the pretrial order specifically refers to this statute, the 12th count of the complaint clearly invokes it by charging these defendants, "[a]cting under color of the authority conferred upon them by the law of the State of New Jersey, specifically N.J.S.A. 18A:64A-1 et seq.," with adopting and enforcing a policy "which constitutes a violation of the specific civil and property rights of the plaintiff, without due process of law," and with stripping plaintiff of "her academic rank and academic title, and of the status of tenure" pursuant to "this policy of suppressing free speech." These allegations satisfy the requirement that to state a claim under § 1983 a plaintiff must allege deprivation of a constitutional right done under color of state law. Williams v. Gorton, 529 F.2d 668, 670 (9 Cir.1976); Nottelson v. A.O. Smith Corp., 397 F. Supp. 928, 930 (E.D. Wis. 1975).
It is not a matter of dispute that the individual defendants here were acting under color of state law, since the college is a public educational institution established by authority of N.J.S.A. 18A:64-1 through 29. See N.J.A.C. 9:4-1.1. And it is also to be noted that state courts have concurrent jurisdiction with federal courts over civil rights actions. Long v. District of Columbia, 152 U.S. App. D.C. 187, 469 F.2d 927, 937 (D.C. Cir.1972); cf. Gray v. Serruto Builders, Inc., 110 N.J. Super. 297, 301 (Ch. Div. 1970). See also, Travel Agts. Malpractice v. Regal Cultur. Soc., Inc., 118 N.J. Super. 184, 195 (App. Div. 1972), certif. den. 60 N.J. 353 (1972).
In order for us intelligently and fairly to appraise the trial judge's disposition of the civil rights phase of the case, a review of the applicable principles of law is in order.

A
As was said in Laverne v. Corning, 522 F.2d 1144, 1147 (2 Cir.1975), any discussion of qualified immunity, also referred to as the "good-faith defense," must start with the *133 case of Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). The court there held that in a § 1983 action against police officers for making an unconstitutional arrest, the defense of good faith and probable cause was available to them. Pierson was followed by Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), which involved a § 1983 suit against the governor and National Guard personnel of Ohio stemming from the Kent State shootings in May 1970. The court said that in dealing with higher officers of the executive branch the inquiry is "far more complex since the range of decisions and choices  whether the formulation of policy, of legislation, of budgets, or of day-to-day decisions  is virtually infinite." 416 U.S. at 246, 94 S.Ct. at 1691. Thus,
* * * [t]hese considerations suggest that, in varying scope, a qualified immunity is available to officers of the executive branch of government, the variation being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based. It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good-faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct. [at 247-248, 94 S.Ct. at 1692]
More in point is the recent case of Wood v. Strickland, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), which considered the matter of good-faith immunity as it applied to school administrators and school board members and sought to resolve differing concepts in the lower federal courts of the nature of the immunity in such cases. Observing that liability for every action found subsequently to have been violative of a student's constitutional rights and to have caused compensable injury would unfairly impose upon the school decision maker the burden of mistakes made in good faith in the course of exercising his discretion within the scope of his official duties, the court explained:
*134 We think there must be a degree of immunity if the work of the schools is to go forward; and, however worded, the immunity must be such that public school officials understand that actions taken in the good-faith fulfillment of their responsibilities and within the bounds of reason under all the circumstances will not be punished and that they need not exercise their discretion with undue timidity. [at 321, 95 S.Ct. at 1000]
The court said further that the applicable standard of good faith involves both "objective" and "subjective" elements. Thus, while the official must act sincerely and with a belief that he is doing right, ignorance or disregard of settled, indisputable law resulting in a violation of a student's constitutional rights cannot be justified. Id. at 321, 95 S.Ct. 992.
Therefore, in the specific context of school discipline, we hold that a school board member is not immune from liability for damages under § 1983 if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the student. This is not to say that school board members are "charged with predicting the future course of constitutional law." Pierson v. Ray, supra, 386 U.S., at 557, 87 S.Ct. [1213], 1219. A compensatory award will be appropriate only if the school board member has acted with such an impermissible motivation or with such disregard of the student's clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith. [at 322, 95 S.Ct. at 1001]
Although Wood v. Strickland dealt with the individual responsibility of school board members for disciplinary proceedings against students, the immunity standards there discussed are equally applicable to situations, such as the one under review, involving the conduct of administrators and trustees of public institutions of higher learning affecting the rights of faculty members. See Hostrop v. Bd. of Jr. College Dist. No. 515, 523 F.2d 569, 577 (7 Cir.1975), cert. den. 425 U.S. 963, 96 S.Ct. 1748, 48 L.Ed.2d 208 (1976); and cf. Shirley v. Chagrin Falls Exempted V.I. *135 Schs. Bd. of Ed., 521 F.2d 1329, 1332 (6 Cir.1975), cert. den. 424 U.S. 913, 96 S.Ct. 1111, 47 L.Ed.2d 317 (1976).

B
With the foregoing principles and standards in mind, we proceed to a scrutiny of the trial judge's resolution of the issues, a task made more onerous by a regrettable absence of meaningful findings of fact in several critical areas. As we said in Reiser v. Simon, 63 N.J. Super. 297, 300-301 (App. Div. 1960), a trial judge must be explicit in his recital of the evidence and in his factual findings and must so correlate them to his legal conclusions that the judgment entered manifestly appears to be undergirded by legal proof of substantial probative value and by specific factual findings thereon. Despite the shortcomings in the trial judge's opinion, we intend, to the fullest extent possible, to make a complete determination of the matter, exercising such original jurisdiction as may be necessary to achieve that end. R. 2:10-5.
The burden was on plaintiff to prove that her discharge from employment was predicated at least in part on her exercise of First Amendment rights. See Roseman v. Indiana, 520 F.2d 1364, 1367 (3 Cir.1975), cert. den. 424 U.S. 921, 96 S.Ct. 1128, 47 L.Ed.2d 329 (1976); Connealy v. Walsh, 412 F. Supp. 146, 154 (W.D. Mo. 1976). She carried that burden. The trial judge here correctly held that plaintiff's comments in the editorial were protected by the First Amendment. And we are also satisfied of the soundness of his conclusion that the decision "not to rehire her was precipitated by the exercise of her First Amendment rights." But while these holdings, quite apart from the due process issue, which pertained to plaintiff's complaint that she was not accorded a hearing on the termination of her employment, amply supported the relief encompassed within paragraphs one through four of the judgment, they would not necessarily entitle plaintiff to prevail *136 in her § 1983 action against the individually named defendants. This is so because of their right to interpose a qualified immunity from damages.
It should be noted, however, that once plaintiff established a prima facie right to damages, it then became incumbent upon defendants to seek the shield of immunity. The qualified immunity available to them under Wood v. Strickland, supra, is an affirmative defense on the merits which must be alleged in the pleadings and factually proven by the one asserting it. Zeller v. Donegal School Dist. Bd. of Ed., 517 F.2d 600, 612 (3 Cir.1975). The defense of immunity is not spelled out either in the answers filed by these defendants or in the pretrial order as they appear in the joint appendix, an omission probably accounted for because Wood v. Strickland had not yet been decided. It seems to have been raised at trial, however, since the trial judge states in his opinion that "[d]efendants contend that they are immune from liability under Section 1983." We shall consider the defense as properly in the case.
The trial judge, applying the standard of Wood v. Strickland, concluded that "it is clear that defendants, in recommending and voting to terminate plaintiff Endress should have known that their action in adopting the resolution violated Endress' constitutional rights." But the conclusion reached is buttressed neither by supporting factual findings nor by a sufficient consideration of the guidelines in Wood v. Strickland. It was an over-simplification of the problem for the trial judge to say that unless plaintiff's employment was terminated for the alleged abuse of her position as faculty advisor or unless defendants proved that she had knowingly or recklessly made false statements with regard to the board chairman, "the defendants did violate Endress' First Amendment rights by adopting the June 27, 1974 resolution terminating her employment * * *."
There should have been a consideration of the objective and subjective criteria of good faith mandated by Wood v. Strickland; that is, the subjective aspect of whether the official *137 acted sincerely and with a belief that he was doing right, and not with the malicious intention to cause a deprivation of constitutional rights; and, if that test was met, the objective standard of whether the official knew or reasonably should have known that his act would violate the clearly established constitutional rights of plaintiff. Hostrop v. Bd. of Jr. College Dist. No. 515, supra, 523 F.2d at 577. See also Imbler v. Pachtman, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed. 2d 128 (1976), and see, Laverne v. Corning, supra, 522 F.2d at 1150; Thonen v. Jenkins, 517 F.2d 3, 6 (4 Cir.1975); Chaudoin v. Atkinson, 406 F. Supp. 32, 35 (D. Del. 1975); Burkhart v. Saxbe, 397 F. Supp. 499, 502 (E.D.Pa. 1975).
Nevertheless, our independent review of the record satisfies us that the conclusion reached was correct, at least with respect to the abridgement of plaintiff's First Amendment rights. It is not open to question, nor was it at the time of these events, that activities connected with the publication of a student newspaper are within the protection of that provision of the United States Constitution. See Papish v. University of Missouri, 410 U.S. 667, 93 S.Ct. 1197, 35 L.Ed.2d 618 (1973); Bertot v. School District No. 1, Albany County, Wyo., 522 F.2d 1171, 1183 (10 Cir.1975). Plaintiff was not excluded because of her position as faculty advisor. In fact, defendants' own expert acknowledged that a faculty advisor who wrote an editorial for a student publication would be entitled to First Amendment protection. There is, moreover, no proof in this case that her activities led to a material or substantial disruption of class work or to substantial disorder or the invasion of the rights of others. Id. at 1183. See also, Connealy v. Walsh, supra, 412 F. Supp. at 155. Cf. Pietrunti v. Brick Tp. Bd. of Ed., 128 N.J. Super. 149 (App. Div. 1974), certif. den. 65 N.J. 573 (1974), cert. den. 419 U.S. 1057, 95 S.Ct. 640, 42 L.Ed.2d 654 (1974). We perceive no counter-vailing public interest here which would justify a restriction of plaintiff's First Amendment activity. See *138 Pickering v. Board of Education, supra, 391 U.S. at 568, 88 S.Ct. 1731.
We are quite willing to credit each of the individual defendants with acting sincerely and with the belief that he or she was doing right, and without any malicious intent to cause a deprivation of constitutional rights. We thus accord to each the benefit of the subjective criterion of good faith, despite the failure of these defendants (excepting President Smith) to testify. Even so, lack of intent on their part to violate plaintiff's constitutional rights would not necessarily be a defense if they should reasonably have known that their conduct would have that effect. Hennings v. Grafton, 523 F.2d 861, 864 (7 Cir.1975); Chaudoin v. Atkinson, supra, 406 F. Supp. at 35.
In the case of President Smith we have already expressed our concurrence in the trial judge's appraisal of his conduct. We have no doubt that plaintiff's writing of an editorial critical of the chairman of the board of trustees prompted Smith to embark upon the course of action which ultimately led to his recommendation that she be discharged. Applying the objective criterion of Wood v. Strickland, he must be held to a standard of conduct based upon knowledge of the basic, unquestioned rights of plaintiff. We are thoroughly satisfied that he reasonably should have known that the action he took would cause a deprivation of plaintiff's First Amendment rights.
But we do not believe the record would support the conclusion that the trustees were similarly motivated in adopting the resolution of June 27, 1974. It has not been demonstrated that they acted for reasons other than those enumerated in the president's recommendation, and those, it is to be noted, were couched in terms of plaintiff's failure properly to perform her duties as faculty advisor to the student newspaper.
However, they are nonetheless not to be excused if the effect of their action was to abridge plaintiff's exercise of her First Amendment rights and they reasonably should *139 have known that such would be the result, for they, too, were chargeable with knowledge of plaintiff's basic, unquestioned constitutional rights. The record establishes that the trustees were clearly aware of the editorial and the resulting furor. The conclusion is inescapable that no matter how the reasons for the discharge may have been worded, the "underpinning throughout was primarily [plaintiff's] acts in connection with the newspaper." Cf. Bertot v. School District No. 1, Albany County, Wyoming, supra at 1183.
The point to be stressed is that careless disregard or negligent ignorance of clear, well-established constitutional rights will not insulate these defendants from liability. Cf. Knell v. Bensinger, 522 F.2d 720, 725 (7 Cir.1975).
We do not reach a like result with respect to plaintiff's further complaint that as she was not accorded a hearing with respect to the termination of her employment, she was denied due process of law and thus deprived of another constitutional right. There seems to be some question whether the issue was actually raised below, since it does not appear in those words in the complaint and pretrial order, and the trial judge remarked that "[a]lthough not specifically briefed, plaintiff Endress suggests that her procedural due process rights were violated in that she never received written notice of the charges against her or an opportunity to be heard before defendants adopted the resolution."
The trial judge concluded that defendants violated plaintiff's procedural due process rights by not according her a hearing before terminating her employment, relying largely on Board of Regents v. Roth, supra, and Perry v. Sindermann, supra. But where our concern, as here, is over the individual liability of these defendants in a § 1983 action, then, as in the case of plaintiff's First Amendment rights, the precise issue is not necessarily whether plaintiff has been deprived of a constitutional right, but whether a basic, unquestioned constitutional right existed of which defendants were chargeable with notice. It is to be noted that neither Roth nor Perry was a § 1983 action; and moreover, *140 they declared, in substance, no more than that a nontenured college teacher who was not rehired for the next academic year was not entitled to a hearing unless he could show that "the decision not to rehire him somehow deprived him of an interest in `liberty' or that he had a `property' interest in continued employment, despite the lack of tenure or a formal contract." Perry v. Sindermann, supra, 408 U.S. at 599, 92 S.Ct. at 2698. But neither case holds categorically that in every such situation a hearing must take place before the taking of the action complained of. In Roth, for example, the court said that where nonrenewal was based on a charge that might damage one's standing and associations in a community, due process would accord an opportunity to refute the charge. 408 U.S. at 573, 92 S.Ct. 2701. And in Perry the court noted that proof of a property interest in continued employment "would obligate college officials to grant a hearing at his request, where he could be informed of the grounds of his nonretention and challenge their sufficiency." 408 U.S. at 603, 92 S.Ct. at 2700. Post-termination hearing procedures, it has been held, would adequately protect one's interests, recognized in Roth, "in not being wrongfully stigmatized by untrue and unsupported administrative charges." Arnett v. Kennedy, 416 U.S. 134, 163, 94 S.Ct. 1633, 1649, 40 L.Ed.2d 15 (1974). Cf. Schoonfield v. Baltimore Mayor and City Council, 399 F. Supp. 1068, 1083 (D. Md. 1975).
While plaintiff was not served with a formal statement of charges, she was fully apprised of the reasons for her termination set forth in the resolution and accompanying document, copies of which were sent to her. It is not in dispute that she did not at any time request an opportunity to be heard.
For our purposes we need not resolve at this time the substantial issue of whether, on the facts here present, plaintiff was entitled to a hearing, either pre- or post-termination, as a matter of constitutional right. As we have said, in a § 1983 action the applicable standard *141 laid down in Wood v. Strickland for determining the personal liability of individual defendants is whether they disregarded a "basic, unquestioned constitutional right" of plaintiff. Our examination of the cases on the subject, beginning with Roth and Perry, leads us to the conclusion that the test has not been met. Even now there is a continuing judicial debate over what constitutes a "liberty" or "property" interest sufficient to entitle one to a constitutional right of procedural due process. See Paul v. Davis, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed. 2d 405 (1976); 2d 684 (1976); Weathers v. West Yuma County School Bishop v. Wood, ___ U.S. ___, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); Weathers v. West Yuma County School Dist. R-J-1, 530 F.2d 1335 (10 Cir.1976); Connealy v. Walsh, supra; Morris v. Laurel School District Bd. of Ed., 401 F. Supp. 188 (D. Del. 1975). It must be remembered that it is the state of the law with respect to procedural due process at the time of the action taken which governs on the issue of the immunity of the individual defendants. Hostrop v. Bd. of Jr. College Dist. No. 515, supra, 523 F.2d at 578. We are satisfied that the law on the subject was such in 1974 that it cannot be said the individual defendants reasonably should have known then that their action would violate a clearly established constitutional right of plaintiff to procedural due process; i.e., the right to a hearing.

C
The trial judge entered judgment against the president of the college and all the trustees except Zuckerman, Corderman and Clayton, for both compensatory and punitive damages. The compensatory award was against them jointly and severally in the sum of $10,000. His preliminary statement, that the "only elements which need be present in order to establish a claim for damages under the Civil Rights Act are that the defendant has deprived the *142 plaintiff of a constitutional right and that the defendant's conduct was under state law," is somewhat misleading. While those elements suffice to establish a prima facie claim for damages, Williams v. Gorton, supra, 529 F.2d at 670, a compensatory award in a case like this, according to Wood v. Strickland, "will be appropriate only if [the school official] has acted with such an impermissible motivation or with such disregard of the [plaintiff's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith." In any event, we encounter no difficulty in concluding, for reasons expressed earlier herein, that plaintiff was entitled to compensatory damages against these defendants because of the deprivation of her First Amendment rights. See Basista v. Weir, 340 F.2d 74, 85-88 (3 Cir.1965). The further issue confronting us is whether the amount awarded was justified by the evidence, bearing in mind that an award of damages is left to the sound discretion of the trier of the fact; i.e., discretion based upon proof of supportive facts and circumstances. Manfredonia v. Barry, 401 F. Supp. 762, 770 (E.D.N.Y. 1975).
There was no proof in this case of out-of-pocket losses to plaintiff occasioned by the violation of her constitutional rights (as contrasted with damages suffered from the rescission of the contract). However, it is well established that compensatory damages may be awarded for deprivation of a federal right even though no such expenses are shown. Paton v. La Prade, 524 F.2d 862, 872 (3 Cir.1975); Seaton v. Sky Realty Co., Inc., 491 F.2d 634, 636 (7 Cir.1974); Donovan v. Reinbold, 433 F.2d 738, 732 (9 Cir.1970); Manfredonia v. Barry, supra. Compensation may be had for consequential emotional and mental distress, Donovan v. Reinbold, supra, including humiliation, which may be inferred from circumstances as well as established by the testimony. Seaton v. Sky Realty Co., Inc., supra. Cf. Zahorian v. Russell Fitt Real Estate Agency, 62 N.J. 399 *143 (1973); and see, Gray v. Serruto Builders, Inc., 110 N.J. Super. 297 (Ch. Div. 1970).
In Hostrop v. Bd. of Jr. College Dist. No. 515, supra, 523 F.2d at 579-580, the court observed that while the amount of damages in such cases could not be determined by reference to an objective standard, the factors to be considered by the trier of the fact in making an award "will include the nature of the constitutional deprivation and the magnitude of the mental distress and humiliation, as well as any other injury caused as a result of being deprived of federally protected rights * * *."
All that the trial judge said on the issue in this case was that
* * * I think plaintiff Endress is entitled to compensatory and punitive damages. She suffered the shame and mental anguish of being summarily terminated without any opportunity to give her side of the controversy. She experienced problems when she tried to get a job from Middlesex Community College. I am sure this suit will remain with her regardless of what the verdict of this Court may be. It is difficult to put a figure.
Presumably the trial judge was seeking to justify only the compensatory award of $10,000, but we find little support in the record for his description of what he conceived to be the impact of the discharge upon plaintiff. The extent of her testimony pertinent to this issue was merely that she learned that she had been fired upon her return from vacation, that when she sought other employment at Middlesex Community College she was asked about the litigation, and that she did not seek employment outside the Monmouth County area because it would mean removing her child from nursery school. She said nothing whatever about any mental or emotional distress or humiliation. Granted that one may reasonably infer some such effect upon her, nevertheless, taking into account all relevant factors as they are revealed in or may reasonably be inferred from the meager proofs on the issue, we are of the view that the award of $10,000 was not justified. In fact, it *144 was so excessive as to take on a punitive aspect. We think, therefore, that the award was a mistaken exercise of discretion on the part of the trial judge and calls for a reduction at the appellate level.[7] Despite our reluctance ordinarily to interfere with a verdict on the ground of excessiveness, we should not hesitate to do so where, as here, such relief is clearly warranted.
From our independent review of the record, taking into account the absence of proof of any significant emotional effect upon plaintiff as the result of the action taken and considering the factors referred to above, we are of the view that the sum of $2500 will fairly and adequately compensate her for the deprivation of her civil rights. The award is modified accordingly.

D
On the subject of the punitive damage award of $10,000 against each of the individual defendants conceived, the trial judge's explanation was limited to the comment that "[p]unitive damages are absolutely necessary to impress upon the people who are in authority and other people in authority that an employee's constitutional rights may not be infringed."
An award of punitive damages, also termed exemplary damages, is discretionary and not a matter of right. Discretion here means "legal discretion in the exercise of which the trial judge must take into account the applicable law and the particular circumstances of the case, to the end that a just result is reached." Security Corp. v. Lehman Associates, Inc., 108 N.J. Super. 137, 145 (App. Div. 1970). Punitive damages are allowed "to punish the wrongdoer for a willful act and to vindicate the rights of *145 a party in substitution for personal revenge, thus safeguarding the public peace." Winkler v. Hartford Acc. and Indemn. Co., 66 N.J. Super. 22, 29 (App. Div. 1961), certif. den. 34 N.J. 581 (1961). While each case must be governed by its own facts, the generally recognized factors are "(1) actual malice, which is nothing more or less than intentional wrongdoing  an evil-minded act; or (2) an act accompanied by a wanton and willful disregard of the rights of another" La Bruno v. Lawrence, 64 N.J. Super. 570, 575 (App. Div. 1960), certif. den. 34 N.J. 323 (1961).
In the context of a § 1983 action, punitive damages are recoverable provided there is a finding that the conduct of the public official "manifests a reckless indifference to the property rights of others, illwill, a desire to injure or malice." Silver v. Cormier, 529 F.2d 161, 163 (10 Cir.1976). See also, Seaton v. Sky Realty Co., Inc., supra, 491 F.2d at 638; Sexton v. Gibbs, 327 F. Supp. 134 (N.D. Tex. 1970), aff'd 446 F.2d 904 (5 Cir.1971), cert. den. 404 U.S. 1062, 92 S.Ct. 733, 30 L.Ed.2d 751 (1972). There seems to be no substantial difference between the federal standard and that of this jurisdiction. It is to be noted, additionally, that "punitive damages are not a favorite in the law and are to be allowed only within narrow limits." Fisher v. Volz, 496 F.2d 333, 347 (3 Cir.1974).
As to the individual defendants, other than the college president, the record is devoid of any findings whatever to support either the award of such damages or the amount thereof. There is, moreover, nothing in the record which even remotely suggests that the trustees acted maliciously or with a wanton and willful disregard of plaintiff's rights. The most that can be said about them is that they reasonably should have known that their action violated plaintiff's constitutional right. This is not enough to warrant the infliction of punitive damages. The award against them is accordingly vacated.
Not so, however, with respect to President Smith. There is enough to support an award against him, although *146 the record does not contain specific findings pointing directly to the issue of punitive damages. The amount thereof is another matter. Allowing for the somewhat disjointed nature of the opinion below, it is clear from a reading of it in its entirety that the trial judge found malice in the conduct of President Smith toward plaintiff, and that this finding could reasonably have been reached on sufficient credible evidence in the record. State v. Johnson, supra, 42 N.J. at 162. We extract these remarks: "Smith had already made up his mind. On June 7th he had decided on termination and then reached out for written support." "I find that he [Dr. Gallagher] was ordered by Smith to write the recommendation for termination * * *. It is perfectly clear that Smith wanted written support for his decision to recommend termination." Though in the specific context of plaintiff's additional assertion of a tortious interference with her contractual relation, but pertinent as well to the § 1983 claim, the trial judge said, further, that "[i]n the present case plaintiff Endress has not demonstrated that Corderman acted with malice. Smith however, did. It is perfectly clear that Smith from April 26th, 1974 on embarked upon a campaign of getting the evidence that would justify the termination of Endress."
But we conclude, after a careful review of the record, and with appropriate awareness of the discretion of the trial judge in such matters, that an award of $10,000 in the circumstances here present is so disproportionate to the injury suffered by plaintiff from the violation of her constitutional rights that it must have resulted from mistake on the part of the trial judge, particularly in the absence of any explanation by him of why he considered that amount to be fair and reasonable. We are convinced that the sum of $2500 as punitive damages in the case of President Smith is a sufficient penalty to impose upon him for his wrongful conduct and as a deterrent against such action in the future. The award is reduced accordingly.

*147 E
We come now to the allowance of attorneys' fees in the amount of $10,000. The trial judge's concept was that the rule on the allowance of such fees "is settled that in cases such as this an award may be made in the exercise of the equity powers of the Court," citing Fairley v. Patterson, 493 F.2d 598, 605 (5 Cir.1974).
It is now thoroughly established in this State that "sound judicial administration will best be advanced by having each litigant bear his own counsel fee except in those few situations specially designated in R.R. 4:55-7 [now R. 4:29-9]." Gerhardt v. Continental Ins. Co., 48 N.J. 291, 301 (1966). This is in accord with the rule generally followed throughout the United States that attorneys' fees are not ordinarily recoverable without statutory or contractual authorization. See Fleischmann v. Maier Brewing Co., 386 U.S. 714, 717, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967).
However, the United States Supreme Court has recognized the equitable power of federal courts to award attorneys' fees when the interests of justice so require. Hall v. Cole, 412 U.S. 1, 5, 93 S.Ct. 1943, 1946, 36 L.Ed.2d 702 (1973). Thus, said the court, "it is unquestioned that a federal court may award counsel fees to a successful party when his opponent has acted `in bad faith, vexatiously, wantonly, or for oppressive reasons.'" Id. This has also been called the "unreasonably and obdurately obstinate" behavior standard. Fairley v. Patterson, supra at 606. Another established exception involves cases in which the plaintiff's successful litigation confers "a substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the costs proportionately among them" Hall v. Cole, supra, 412 U.S. at 5, 93 S.Ct. at 1946. A third exception, carved out in the lower federal courts, is "the private attorney general" theory, *148 under which attorneys' fees are granted to private plaintiffs for aiding in effectuating important congressional and public policies. Fairley v. Patterson, supra. See also Monaghan, "The Supreme Court, 1974 Term," 89 Harv. L. Rev. 1, 170 (1975).
Since there is no statutory authorization for the awarding of attorneys' fees to successful § 1983 plaintiffs, the federal courts, where fees have been allowed in such cases, have rested the award on one of the exceptions noted above. See, e.g., Bridgeport Guard, Inc. v. Members of Civ. Serv. Com'n, 497 F. 2d 1113, 1115 (2 Cir.1974), cert. den. 421 U.S. 991, 95 S.Ct. 1997, 44 L.Ed.2d 481 (1975); Stolberg v. Members of Bd. of Tr. for State Coll. of Conn., 474 F.2d 485, 490 (2 Cir.1973). See also, Thonen v. Jenkins, supra, 517 F.2d at 6; Lee v. Southern Home Sites Corp., 429 F.2d 290, 295 (5 Cir.1970). But in Alyeska Pipeline Service v. Wilderness Society, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), the court limited the power of the federal courts to award attorneys' fees, holding, after an extensive historical review of the subject, that the equitable jurisdiction of federal courts does not encompass authority to award counsel fees to private attorneys general. But it reaffirmed the equitable authority to award counsel fees under the bad faith and common benefit theories. See King v. Caesar Rodney School Dist., 396 F. Supp. 423, 427 (D. Del. 1975).
The question to which the court below did not address itself is whether, in a § 1983 action, since the statute does not provide for counsel fees, a state court, in the exercise of its concurrent jurisdiction over the subject-matter, may allow attorneys' fees where such fees are not permitted by the rules of that court. In other words, may the state court, in such cases, bypass its own rules and rely upon the equitable jurisdiction exercised in the federal courts?
Counsel have not cited to us any case in point, and our own research has disclosed none, at least in this jurisdiction. Nevertheless, we hold that in the absence of any provision *149 for such fees in the federal statute, our courts should be guided by our own rules on the subject, and not by what is done in the federal courts in the exercise of their general equitable jurisdiction. It is to be noted that their authority is a broad one, not limited to civil rights actions alone. Were it otherwise, a persuasive argument might be made that, our rules to the contrary notwithstanding, the salutary policy of safeguarding civil rights should warrant our following the federal practice as to attorneys' fees. But in the absence of any such overriding consideration, we perceive no sound reason for not applying R. 4:42-9, which expresses the substantial policy of this State that attorneys' fees should not be allowed except in the instances enumerated. Consequently, since no authorization is contained therein for an allowance of a fee for legal services in a case of this nature, the award of one here was inappropriate and should be set aside.

VI
Two miscellaneous matters remain for consideration:
First, defendant trustees argue that the pretrial settlement of $900 for the libel and slander counts of the complaint, for which plaintiff executed a release, should have been credited against the damages awarded her under § 1983. They acknowledge, however, that if one is entitled to recover on two or more causes of action, recovery on one does not necessarily defeat recovery on the others. But they contend that in awarding damages under the Civil Rights Act, the trial judge based such damages upon defamation of character, the same injury encompassed within the libel and slander causes of action. The short answer is that defamation is not the gravamen of a cause of action under § 1983; it is the deprivation of constitutional rights for which the act creates a remedy. The damages awarded by the trial judge here were for emotional distress and humiliation resulting from the violation of plaintiff's constitutional rights.
*150 The second pertains to the asserted cause of action for the alleged interference with plaintiff's contractual relationship. The pertinent segment of the judgment is paragraph 8, which is in favor of plaintiff and against the defendant Smith "with no additional money damages," but contains an extraordinary alternate proviso that if the award of damages in the § 1983 cause of action should be reversed, "then there shall be an award of $10,000.00 compensatory damages and $10,000.00 punitive damages" in favor of plaintiff and against that defendant.
Since we have sustained the judgment against President Smith in the § 1983 action, but with a reduction in the amounts awarded, the alternative proviso becomes moot. However, we are unable to comprehend the procedure adopted by the trial judge. In the first place, we perceive in his discussion of the issue no more than an alternate theory of liability founded upon the same set of facts. Moreover, assuming merit in his conclusion that President Smith had tortiously interfered with plaintiff's contractual relationship, we fail to see any basis for the identical award of compensatory damages. There is clearly a different measure of damage in each case. If there was the tortious interference complained of, plaintiff would have been entitled to compensation for whatever economic losses she suffered as a proximate result thereof. Since she has been awarded back pay and other benefits, there would seem to be no other economic losses. There is absolutely no relationship between the $10,000 compensatory award and the asserted cause of action. We see no need whatever for these provisions. Paragraph eight of the judgment will be vacated.

CONCLUSION
We affirm so much of the judgment as is contained in paragraphs 1 through 4, inclusive; paragraph 7, and paragraphs 9 through 11, inclusive.
*151 That portion of paragraph 5 of the judgment which awards compensatory damages to plaintiff is modified by reducing the amount to $2500; as modified, it is affirmed.
So much of paragraph 5 of the judgment as awards punitive damages against the individually named trustees is reversed. The award of punitive damages against defendant Donald H. Smith is reduced to $2500, and, as modified, that portion of the judgment is affirmed.
Paragraph 6 of the judgment, which awards attorneys' fees, is reversed.
Paragraph 8 of the judgment is vacated.
The matter is remanded solely for the entry of an amended judgment consistent with the foregoing. Jurisdiction is not retained.
NOTES
[1] Plaintiff's existing contract would have expired June 30, 1974. The rescinded contract, which would have given her tenure, was for the period July 1, 1974 - June 30, 1975.
[2] At the close of the trial, judgment was entered in favor of defendants and against the Association. A third plaintiff, New Jersey Education Association, voluntarily withdrew as a party to the action, and an order was entered dismissing with prejudice all claims asserted by it.
[3] It appears that the counts in the complaint alleging libel were settled prior to trial. Counsel for appellants Clark et al. moved, among other things, for leave to file a supplemental appendix and include therein a copy of the release executed by plaintiff, but which was not placed in evidence at the trial. We granted the motion with the proviso that plaintiff's objection thereto "shall be deemed a motion to strike the same," and we reserved decision on that motion until oral argument. Since no issue was raised below with respect to the effect of the settlement and release upon any of the remaining claims, we deem it inappropriate to give any consideration to the matter at this time except as it may affect the quantum of damages awarded. This will be dealt with later herein.
[4] To the extent that such "facts" were not in evidence at the trial, we have disregarded them. This applies as well to the contents of a "report to the Attorney General," a document marked for identification at the trial as D-5, but not received in evidence.
[5] These amici curiae consist of all the county and two-year colleges in New Jersey, except Brookdale, and also The American Council on Education, The American Association of Community and Junior Colleges, The Association of Community College Trustees, The New Jersey Association of Colleges and Universities, the New Jersey School Boards Association and the Association of Governing Boards of Universities and Colleges.
[6] None of the parties to the controversy raised the question of exhaustion of administrative remedies in the pleadings or the pretrial order, at the trial, or on this appeal. We decline to consider it now. Cf. Nieder v. Royal Indemnity Ins. Co., 62 N.J. 229, 234 (1973). Moreover, an amicus curiae must accept the case before the court with the issues made by the parties. 4 Am. Jur.2d, Amicus Curiae, § 3 at 111 (1962). We doubt that it may raise an issue not raised by them. See E. Brunswick Tp. Bd. of Ed. v. E. Brunswick Tp. Council, 48 N.J. 94, 107 (1966); cf. Casey v. Male, 63 N.J. Super. 255 (Cty. Ct. 1960).
[7] For an illustrative compilation of damage awards in civil rights cases, all of which are substantially below the amount in this case, see Manfredonia v. Barry, supra, 401 F. Supp. at 771 (footnote).